Christopher M. STEVENS, Petitioner,

v.

Daniel McBRIDE, Respondent.

No. 4:03–CV–005 AS.

United States District Court,
N.D. Indiana,
Hammond Division.

Jan. 13, 2005.

Alan C. Rossman PHV, Cleveland, OH, Kathy Lee Stinton-Glen, Zionsville, IN, for Petitioner.

Stephen R. Creason, Indiana Attorney General's Office, Indianapolis, IN, for Respondent.

## MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

This proceeding is a petition filed by counsel on behalf of the petitioner, Christopher M. Stevens, seeking relief under 28 U.S.C. § 2254 from a state court criminal proceeding in which he was sentenced to death. An extended oral argument, lasting nearly 2 hours, was held on the petition in South Bend, Indiana on December 6, 2004. This court greatly appreciates the professional services of appointed counsel for Mr. Stevens.

Two published opinions of the Supreme Court of Indiana will provide the basic factual setting of this case. In *Stevens v. State,* 691 N.E.2d 412 (Ind.1997), the unanimous decision of the Supreme Court of Indiana was written by Chief Justice Shep-

ard and entered on December 31, 1997. In *Stevens v. State,* 770 N.E.2d 739 (Ind. 2002), the unanimous decision of the Supreme Court of Indiana was written by Justice Dickson and entered on June 26, 2002. The massive state record has been filed and examined here pursuant to the mandates of *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), as well as 28 U.S.C. § 2254.

### I. STANDARD OF REVIEW

[U]nder § 2254(d) it must be shown that the [state] Supreme Court's decision was either contrary to, or an unreasonable application of, [the United State Supreme Court's] clearly established precedents, or was based upon an unreasonable determination of the facts.

*Price v. Vincent,* 538 U.S. 634, 639, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003).

[A] decision by a state court is "contrary to" our clearly established law if it "applies a rule that contradicts the governing law set forth in our cases" or if it confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.

*Price,* 538 U.S. at 640, 123 S.Ct. 1848. (Quotation marks omitted.)

[T]he phrase "clearly established Federal law, as determined by the Supreme Court of the United States" ... refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision.

*Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389, (2000).

[A]s the statutory language makes clear, ... § 2254(d)(1) restricts the source of clearly established law to this Court's jurisprudence.

*Williams,* 529 U.S. at 412, 120 S.Ct. 1495.

As we have explained, a federal habeas court may not issue the writ simply be-

cause that court concludes in its independent judgment that the state-court decision applied a [United States] Supreme Court case incorrectly. Rather it is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner.

*Price,* 538 U.S. at 641, 123 S.Ct. 1848 (quotation marks, citations and brackets omitted). *See also Early v. Packer,* 537 U.S. 3, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002), *Woodford v. Visciotti,* 537 U.S. 19, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002), and *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)

■ Thus, the United States Supreme Court has made clear that it is not for this court to decide the merits of the petitioner's arguments from scratch. Rather, the task laid out before this court in a § 2254 habeas corpus petition is to determine whether the decision of the state court, in this case the Indiana Supreme Court, falls outside of that broad swath of reasonable interpretations of the law based solely on the holdings of United States Supreme Court opinions at the time of the state court decision.

## II. LETTER REQUESTING DISMISSAL

As a preliminary matter, the petitioner, acting *pro se,* wrote a handwritten letter to this court asking that this case be dismissed. Given that the court is now denying this habeas corpus petition on the merits, the question of dismissal is rendered moot.

## III. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

The petitioner, in his first three claims for relief, argues that his trial counsel

were ineffective for many reasons. The clearly established law on the Sixth Amendment was presented in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[1] In order to prevail on an ineffective assistance claim, the petitioner must establish two elements: first, that counsel's performance fell below an objective standard of reasonably effective representation; and second, that the "deficient performance prejudiced the defense." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. For the first prong, the petitioner must

identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.

*Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. On the second prong, the petitioner must show a "reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

### A.

■ The petitioner argues that, "delays in the investigations impacted the defense's ability to prepare and secure necessary experts". Petition at 20, docket # 18. The Indiana Supreme Court addressed this claim in reviewing the denial of his post-conviction relief petition.

The defendant claims, in part, that his counsel unreasonably delayed their investigation. Stevens was tried for

---

1. Though the petition contains citations to *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), this case post-

dates the Indiana Supreme Court cases and is therefore inapplicable to the analysis at hand.

murder in January 1995, within seventeen months of his arrest in July 1993. Defense counsel entered their appearances in August 1993. In November 1993 counsel made their first request for funding for experts. This request was granted in May 1994 along with funds for an investigator. Funding for mitigation investigation was secured in January 1994, and a mitigation specialist joined the defense. Defense counsel periodically requested additional amounts for the mitigation, fact, and expert witnesses. Such funding requests were approved. Billing records indicate that information was being gathered, procedural issues were being worked out with the prosecutor and the court, and research was being done on legal issues during the three months before the first funding request. Because of successful motions for continuance, Stevens was not tried until seven months after the time counsel added the psychologist and the fact investigator to their team of a paralegal and mitigation investigator. These facts do not compel a finding of deficient performance in the timing of trial counsel's investigation.

*Stevens v. State*, 770 N.E.2d 739, 748 (Ind. 2002) (footnote and citation omitted). The Indiana Supreme court reviewed the pretrial history of this case and examined the chronological relationship of the events in question. Despite some initial delays, the court found that the fully constituted defense team had seven months to prepare for trial because of counsel's success in postponing the trial. In light of the curative effect of the continuances, it was not an unreasonable application of *Strickland* for the Indiana Supreme Court to hold that these investigative delays were within the range of professionally competent assistance and that they did not render trial counsel ineffective.

## B.

■ The petitioner argues that, "defense counsel secured the services of an incompetent expert without making any effort to familiarize themselves with the potential expert's forensic approach" (petition at 22, docket # 18); that "Dr. Lennon's 'specialty' was not relevant to Christopher Stevens" (petition at 25, docket # 18); that "Dr. Lennon was retained under fraudulent circumstances" (petition at 27, docket # 18); and that "defense counsel were aware that Dr. Lennon's 'myth of mental illness' views were far outside the professional 'mainstream.'" (petition at 27, docket # 18). The Indiana Supreme Court addressed these claims related to expert competence and trial counsel's investigation thereof in the appeal from the denial of his post-conviction relief petition.

Dr. Lennon had been recommended by the mitigation investigator. Other members of the criminal defense community also told Stevens's attorneys that Dr. Lennon had done a "very nice job" in testifying in another death penalty case. Dr. Lennon holds a Ph.D. in clinical Psychology from Miami University in Ohio. He was a psychology professor at St. Joseph's College, where he spent four years as the chair of the Psychology Department, and was clinical director of the Child and Adolescent Psychiatric Center at Humana Hospital in Indianapolis from 1991 to 1994. Dr. Lennon conducted a preliminary evaluation of the defendant prior to April 13, 1994 and met with him five times from June through December 1994. Dr. Lennon also met with the defendant's parents and siblings, and reviewed school records, records from the Hamilton Center, and arrest records. Other individuals from Dr. Lennon's office, including a social worker and another psychologist, participated in evaluations of the defen-

dant. Defense counsel considered Dr. Lennon a good fit because of his expertise in treating children and adolescents, and the defendant's attorneys sought and received a transcript of Dr. Lennon's testimony in a case the attorneys felt had similar issues.

*Stevens v. State,* 770 N.E.2d 739, 747–48 (Ind.2002). It was not unreasonable for the Indiana Supreme Court to have found that Dr. Lennon was a competent expert. He possessed the necessary professional credentials and he examined and evaluated the defendant. It is widely known that there is a great range of opinion within the psychological community. Though the petitioner believes that he could have obtained a more advantageous expert, based on these facts, it was not unreasonable for the Indiana Supreme Court to have found, without regard to his specialties or his approach to psychology, that he was a competent expert. Neither was it an unreasonable application of *Strickland* for the Indiana Supreme Court to hold that the degree to which trial counsel familiarized themselves with Dr. Lennon's credentials, though certainly they could have done more, was within the range of professionally competent assistance.

### C.

The petitioner presents several arguments about Dr. Lennon's report and testimony.

Prior to knowing about Dr. Lennon's 'specialty' or that he fell far outside the professional mainstream of mental health experts, counsel guaranteed that Dr. Lennon would generate a report that would be provided to the State.

Petition at 24, docket # 18.

From "out of the blue" Dr. Lennon generated a completely *unauthorized* report without consulting counsel as to the content of that 'report.'

Petition at 39, docket # 18 (emphasis in original).

Objectively, counsel should never obtain a report from an expert without knowing what is going to be in it.

Petition at 42, docket # 18.

Dr. Lennon devised his own 'strategy' that mandated his unilateral decision to testify at trial.

Petition at 58, docket # 18.

Defense counsel called Dr. Lennon as a penalty phase witness without knowing about what he intended to testify.

Petition at 59, docket # 18.

Dr. Lennon's penalty phase testimony, anchored in the information and opinions served up in the unauthorized 'report,' introduced the issue of 'future dangerousness' into the penalty phase. This was highly prejudicial to Mr. Stevens.

Petition at 60, docket # 18.

The Indiana Supreme Court addressed these claims in the appeal from the denial of his post-conviction relief petition.

The defendant also faults his trial counsel for providing a copy of Dr. Lennon's report to the State prior to trial. We note, however, that the report was provided in compliance with the trial court's order that any reports from experts [were] to be submitted to the State sixty (60) days in advance of trial. On motion of the defense, the trial court extended the deadline for the exchange of reports from experts to July 19, 1994. The defense thereafter supplied the report.

*Stevens v. State,* 770 N.E.2d 739, 748 n. 4 (Ind.2002) (quotation marks and citations omitted).

■ Citing *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the petitioner argues that the Indiana Supreme Court was unreasonable in finding that trial counsel were not ineffective for

agreeing to provide a copy of the report to the State. This was not unreasonable because *Ake* did not require a confidential psychological report.

We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the State the decision on how to implement this right.

*Ake v. Oklahoma,* 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). It was not an unreasonable interpretation of Ake for Indiana to require disclosure of the report. Obviously, if disclosure was required, then so too was the creation of the report; therefore it was not created "out of the blue". Though it is self-evident why defense counsel would like the opportunity to shape and tailor both the psychological report and Dr. Lennon's testimony, *Ake* did not create such requirements. Indeed, *Ake* made clear that an indigent defendant did not have "a constitutional right to choose a psychiatrist of his personal liking. . . ." *Ake,* 470 U.S. at 83, 105 S.Ct. 1087.

### D.

The petitioner presents several arguments concerning intent and the voluntary manslaughter defense versus a mental illness defense.

By defending this case in accordance with the views of Dr. Lennon[,] defense counsel conceded any possible defense that would question Mr. Stevens' "intent" during the commission of the homicide. This was in spite of the fact that counsel were aware of facts that impacted upon the question of the Mr. Stevens' "intent."

Petition at 30, docket # 18.

Defense counsel failed to properly investigate Petitioner's substance and alcohol abuse, failed to develop this evidence, and failed to seek or secure the services of an alcohol and substance abuse expert.

Petition at 35, docket # 18.

In spite of recognizing these shortcomings of Dr. Lennon, and realizing that the defense needed additional experts to defend the case, defense counsels [sic] *never* sought additional funding to secure other experts.

Petition at 43, docket # 18 (emphasis in original).

Defense counsels [sic] adopted a theory of defense that did not focus upon the issue of Mr. Stevens' "intent" at the time of the homicide. The defense of 'Voluntary Manslaughter' was not supported by any facts as counsel knew them to be or law. Defense counsel did not know the law.

Petition at 45, docket # 18.

It was unreasonable and prejudicial for defense counsel to proceed with the untenable 'voluntary manslaughter' defense given that a viable mental illness defense was available.

Petition at 47, docket # 18.

Petitioner was prejudiced by trial counsel's use of the untenable 'voluntary manslaughter' defense. Even if counsel had only been able to secure a 'guilty

but mentally ill' verdict, such would have been a circumstance rendering the death penalty inappropriate.

Petition at 50, docket # 18. The Indiana Supreme Court addressed these claims at length in its review of the denial of his post-conviction relief petition.

> During the guilt phase trial, the defense strategy was to urge that the killing was done in sudden heat and thus, if the defendant were guilty, he was guilty of voluntary manslaughter and not murder. At post-conviction, defense counsel testified that this was one of the alternative theories they had been considering from "day one," and when Stevens's confession was not suppressed, voluntary manslaughter became the theory of the case. Counsel based this theory on a statement in the defendant's confession that he "snapped" or "went off." Defense counsel tendered an instruction on voluntary manslaughter, which the trial court refused to give. During closing argument, defense counsel nevertheless asked the jury to return a verdict of voluntary manslaughter.

> While the defendant argues in retrospect that a mental illness defense would have been more effective, his proposed avenue was not without its pitfalls. The post-conviction court noted that, had defense counsel pursued this defense, they would have opened the door to the admission of substantial incriminating evidence not otherwise presented during the guilt phase. This evidence included testimony of a witness that, upon the defendant's prior release from jail onto probation for a previous conviction of child molesting, the defendant had declared that he planned to kill his next child molesting victim to avoid returning to jail. The trial court determined that defense counsel adequately investigated issues of substance abuse and mental illness and reasonably chose to pursue a different strategy. [FN5] The post-conviction court did not err in denying relief on this claim.

*Stevens v. State*, 770 N.E.2d 739, 749 (Ind. 2002) (citations omitted). In footnote 5, the court stated.

The post-conviction court concluded, in part:

> With the benefit of hindsight, Petitioner's present counsel suggest that trial counsel should have adopted the defense of mental disease or defect (Ind.Code § 35–41–3–6) and should have presented psychiatric evidence that Petitioner was unable to form the *mens rea* necessary to commit intentional murder. However, if Petitioner had raised the insanity defense, he would have opened the door to the admission of incriminating evidence that was not presented during the guilty [sic] phase of his trial.... Moreover, the facts of the crime itself militate against insanity.... Against this backdrop, Dr. Coons's testimony that, in his opinion, Petitioner's ability to appreciate the wrongfulness of his conduct was "impaired" would have had little or no effect on the jury's verdict, particularly in light of Dr. Coons's acknowledgment that Petitioner could appreciate the wrongfulness of his conduct when he took steps to hide Zachary's body.

*Stevens v. State*, 770 N.E.2d 739, 749 n. 5 (Ind.2002) (ellipsis in original, citation omitted). Finally, in a section titled, "Pursuing Voluntary Manslaughter as Defense Theory", the court concluded its discussion.

> The defendant claims that his trial counsel were ineffective for pursuing a "fundamentally flawed" approach to the case by proceeding on a theory of voluntary manslaughter. They tendered

three proposed instructions that dealt with voluntary manslaughter, but these were rejected by the trial court. The defendant argues that there was no evidence in the record to support this theory, and that there was another viable defense available but not used.

The defendant urges that, if defense counsel had consulted other mental health experts, counsel would have learned of the defendant's dissociative disorder, borderline personality disorder, chemical dependency, and LSD impairment at the time of the offense. In the post-conviction proceedings and in this appeal, the defendant's present counsel assert that the defendant was raped as a child; that at the time of the killing the defendant switched his identity with that of Zachary; that the defendant killed Zachary because it's what he would have wanted in that molestation at age 10, to have been killed by his abuser; and that the defendant's ability to appreciate the wrongfulness of his conduct was disengaged when he was dissociating. The defendant argues further that, even if the voluntary manslaughter defense were regarded as legitimate strategy, this would not excuse the failure to present the mental illness defense.

The post-conviction court found that counsel's decision to pursue the voluntary manslaughter strategy, while ultimately unsuccessful, did not amount to deficient performance. The court pointed out that any appreciable evidence of sudden heat justifies an instruction on voluntary manslaughter, and that sudden heat is defined as provocation arising from a variety of emotions. In the defendant's admissions of guilt to his brother, the defendant said that he "clicked" or "went off" when Zachary threatened to tell his parents about the defendant's sexual conduct. In the defendant's confession to police, he stated that he killed Zachary because he was afraid that Zachary would report him. Concluding that the defendant received effective assistance of counsel as to their strategy to pursue voluntary manslaughter instructions, the post-conviction court found that the defendant's trial attorneys pursued the most viable defense available to them.

As to the failure to present a mental illness defense during the guilt phase, the post-conviction court noted that, had defense counsel done so, they would have opened the door to the admission of substantial incriminating evidence not otherwise presented during the guilt phase. As we noted above, this included testimony that, upon the defendant's prior release from jail to probation for a previous conviction of child molesting, the defendant had declared his intent to kill his next child molesting victim to avoid returning to jail.

We conclude that the evidence as a whole does not lead unerringly and unmistakably to a decision opposite that reached by the post-conviction court, and we find that defense counsel's choice of defense theory did not constitute ineffective assistance of counsel.

*Stevens v. State,* 770 N.E.2d 739, 752–53 (Ind.2002) (brackets, quotation marks, and citations omitted).

■ It was not unreasonable for the Indiana Supreme Court to find that pursuing a mental illness defense was fraught with pitfalls and would have had little or no effect on the jury's verdict. Neither was it an unreasonable interpretation of *Strickland* for the Indiana Supreme Court to have held that trial counsel were not ineffective even though they pursued a manslaughter defense and did not pursue a mental illness defense. Though the man-

slaughter defense was unsuccessful, fraught with similar pitfalls as the mental illness defense, and not supported by the evidence which was presented at trial; there are simply some cases for which there is no good defense. *See Florida v. Nixon,* 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004).[2] Trial counsel cannot be deemed ineffective merely because they drew a case with horrific facts which lacked a viable legal theory.

### E.

■ The petitioner argues that "inconsistent state court rulings regarding Mr. Stevens' counsels' [sic] pursuit of a voluntary manslaughter defense support a finding of ineffective assistance of counsel." Petition at 53 (docket # 18). The petitioner argues that it was inconsistent for the Indiana Supreme Court, in his direct appeal, to have affirmed the trial court's refusal to give a voluntary manslaughter instruction and then to have refused, in his post-conviction relief petition, to find his trial counsel ineffective for having pursued the voluntary manslaughter defense. Procedurally, this argument is unsuccessful because neither this court nor the Indiana Supreme Court on post-conviction review, were directly presented with the question of whether the voluntary manslaughter instruction should have been presented to the jury. On post-conviction review, the Indiana Supreme Court stated,

The post-conviction court found that counsel's decision to pursue the voluntary manslaughter strategy, while ultimately unsuccessful, did not amount to deficient performance. The court pointed out that any appreciable evidence of sudden heat justifies an instruction on voluntary manslaughter, and that sudden heat is defined as provocation arising from a variety of emotions. In the defendant's admissions of guilt to his brother, the defendant said that he "clicked" or "went off" when Zachary threatened to tell his parents about the defendant's sexual conduct. In the defendant's confession to police, he stated that he killed Zachary because he was afraid that Zachary would report him. Concluding that the defendant received effective assistance of counsel as to their strategy to pursue voluntary manslaughter instructions, the post-conviction court found that the defendant's trial attorneys pursued the most viable defense available to them.

*Stevens v. State,* 770 N.E.2d 739, 753 (Ind. 2002) (brackets, quotation marks, and citations omitted). Based on this passage, the petitioner appears to conclude that the post-conviction court believed that the voluntary manslaughter instruction should have been given to the jury. Perhaps it did, and perhaps it would have granted the post-conviction relief petition had that question been squarely presented to it. Procedurally, that issue is forfeit because

---

2. Defense Counsel's "concession of Nixon's guilt does not rank as a failure to function in any meaningful sense as the Government's adversary". Although such a concession in a run-of-the-mine [sic] trial might present a closer question, the gravity of the potential sentence in a capital trial and the proceeding's two-phase structure vitally affect counsel's strategic calculus. Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear. Prosecutors are more likely to seek the death penalty, and to refuse to accept a plea to a life sentence, when the evidence is overwhelming and the crime heinous. In such cases, avoiding execution may be the best and only realistic result possible.

*Florida v. Nixon,* 543 U.S. 175, 125 S.Ct. 551, 562, 160 L.Ed.2d 565 (2004) (quotation marks, brackets, citations and footnotes omitted.)

it was not directly raised to either the post-conviction court nor to this one. Yet before anyone second guesses the post-conviction strategy, it must be noted that substantively the language of this passage from the Indiana Supreme Court does not lead unequivocally to the conclusion that it believed its prior ruling was in error.

The post-conviction court speaks of "any appreciable evidence of sudden heat" and it gives two examples of how trial counsel may have believed that they had such evidence. It then concludes by saying, not that trial counsel's strategy was outstanding, but rather that it was the best they had. As previously discussed, this case was so fraught with problems, they did not have much with which to work. Therefore, though the trial court, the Indiana Supreme Court on direct appeal, and the prior caselaw all held that the voluntary manslaughter defense was inapplicable here, trial counsel's selection of this unsuccessful defense and direct appellate counsel's inability to convince the Indiana Supreme Court to broaden the voluntary manslaughter defense did not render them ineffective.

## F.

■ The petitioner argues that "having introduced evidence as to their client's future dangerousness, defense counsel failed to adequately address the issue of life without parole." Petition at 61 (docket #18). The Indiana Supreme Court addressed this claim in reviewing the denial of his post-conviction relief petition.

The defendant contends that his trial counsel were deficient for failing to tender a penalty phase instruction that would have informed the jury of the "true effect" of life without parole. He argues that such an instruction was needed to offset the possibility that a juror might believe that if sentenced to life without parole, the defendant could be released early. The defendant argues that such an explanation should have been provided because there had been evidence on the issue of future dangerousness and because his trial counsel allegedly provided misguided speculation during jury selection when responding to a potential juror's question concerning the meaning of life without parole.

The post-conviction court's decision noted that it is unnecessary to instruct juries on words that are commonly understood. The court found that "life without the possibility of parole" consists of common words that may be easily understood by persons of average understanding. It also found that had any such instruction been tendered it would have been refused. The post-conviction court concluded that the defendant had received effective assistance of counsel as to this claim. We agree and decline to find ineffective assistance of trial counsel on this issue.

*Stevens v. State,* 770 N.E.2d 739, 755–56 (Ind.2002) (citations, footnote and quotation marks omitted).

Citing *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), the petitioner argues that he "was denied his right to have the jury informed of the true effect of one of the sentencing options." Petition at 64, docket #18. In *Simmons,* the trial court refused to inform the jury that the defendant would not be eligible for parole and the United States Supreme Court held that juries must be so informed when that is a sentencing option. It was not unreasonable for the Indiana Supreme Court to have held that the trial court in this case complied with the requirements of *Simmons* when the jury was told that "life without the possibility of parole" was a sentencing option.

## G.

The petitioner presents several arguments related to the penalty and sentencing phase of his trial.

Counsel's failure to investigate the abuse, brutality, and humiliation of Mr. Stevens' childhood undermined the penalty phase mitigation presentation.

Petition at 64, docket # 18.

The untapped mitigation evidence that counsel failed to present during the penalty phase of trial prejudiced Mr. Stevens.

Petition at 68, docket # 18.

Counsel rendered ineffective assistance when, during the Penalty Phase arguments the Defense rejected any explanation for the offense.

Petition at 71, docket # 18.

The sentencing phase of the trial was a replay of the ineffective and prejudicial penalty phase.

Petition at 72, docket # 18.

The Indiana Supreme Court addressed these claims in reviewing the denial of his post-conviction relief petition.

The defendant contends that his trial counsel were deficient during the penalty phase and sentencing hearing by failing to present sufficient evidence of mitigating circumstances. The defense presented various witnesses and evidence showing various mitigating circumstances including his parents' divorce and his living in the homes of different people while growing up, the defendant's troubled childhood including suffering childhood sexual abuse, his adolescent alcohol and drug use and diagnoses of passive personality, his depression and suicide attempts, and his poor academic performance. The defendant's post-conviction counsel, however, assembled several witnesses to testify regarding information and theories that were not employed by defense trial counsel.

The defendant first argues that his trial lawyers unreasonably limited their penalty phase and sentencing presentations to events of his life that occurred before age 18 and that his counsel unreasonably relied upon Dr. Lennon, rather than presenting other psychological experts regarding the defendant's mental or emotional distress at the time of the killing. He argues that Dr. Lennon "was a fatal witness for the defense," noting that on cross-examination by the State, Dr. Lennon agreed with the State's theory that Zachary's murder appeared directly related to the defendant's fear of having to return to prison, and the defendant was not susceptible to traditional psychotherapy and was a serious danger to society. The defendant further urges that his trial counsel failed to present a reason for the defendant's crime. He argues that counsel should have presented expert evidence that, at the time of the killing, the defendant was under a mental disease or defect, with an impaired ability to appreciate the wrongfulness of his conduct and conform it to the law; that he was very likely influenced by the interactive use of drugs; that his disorders were treatable with medication and intensive, individual psychotherapy; and that he would not constitute a pedophilia threat in prison.

The post-conviction court rejected these claims. The court observed that expert witness opinions suggesting that the defendant had an impaired ability to appreciate the wrongfulness of his conduct would have been strongly contradicted by the extensive evidence of the defendant's multiple attempts to kill Zachary and then carefully to take steps to cover-up the crime. The court noted that even one of the defendant's own

experts at post-conviction acknowledged that the defendant could appreciate the wrongfulness of his conduct when he took steps to hide Zachary's body. The post-conviction court later concluded:

Defense counsel were not ineffective for failing to investigate and prepare evidence of organic and mental impairments, including dissociative disorders, borderline personality disorders, and the effects of long-term drug use. Defense counsel's investigation of Petitioner's mental health and prior use of drugs was reasonable. Both of defendant's trial counsel testified that they were aware of Petitioner's prior drug abuse. Dr. Lennon was also aware of Petitioner's prior drug abuse. However, Petitioner denied having recently used drugs: he "used to do drugs, used to drink," but that he stopped drinking when he got arrested for child molesting, and "had stopped smoking marijuana awhile before that, long before that, pretty much cause my sister got killed by a guy that was high and ever since that I had, I had gone from doing it heavy to real light and then stopped." Moreover addiction counselor Needham evaluated Petitioner in January 1993 and found that Petitioner did not have a drug or alcohol problem. Thus, defense counsel's investigation was reasonable.

Moreover, had defense counsel adopted the strategy of emphasizing Petitioner's prior drug use, this would have been inconsistent with their mitigation strategy of portraying Petitioner as the passive victim of abuse. As Dr. Lennon testified, so much of Petitioner's behavior could be explained by the abuse, the neglect that he's had on top of his genetic predisposition, and then you look at all the drugs that he's been surrounded with his birth mother, and then the fact that she probably—even though she denies it, the evidence will suggest that she probably did do drugs or alcohol during pregnancy. Had defense counsel elicited evidence of Petitioner's prior use of illicit drugs, he would no longer appear to be a passive victim molded by outside forces, but would appear as someone who had actively decided to break the law. As the Seventh Circuit explained in *Stewart v. Gramley*, [w]hat is brought out during the penalty phase that will help a defendant is what goes to show that he is not as "bad" a person as one might have thought from the evidence in the guilt phase of the proceeding. What is brought out that will hurt him is what goes to show that he is, indeed, as bad a person, or worse, than one might have thought from just the evidence concerning the crime. Defense counsel was not ineffective for failing to pursue a mitigation strategy that could have caused the jury to think that Petitioner had a more extensive history of lawbreaking than was otherwise apparent.

The post-conviction court thus found that defense counsel were aware of petitioner's past drug abuse and investigated the mental health issues through the use of Dr. Lennon. Further, the court found that presenting the petitioner's chronic drug abuse would cut against the defense strategy of portraying the petitioner as a passive victim of abuse rather than someone with an extensive history of lawbreaking. The court determined that the strategic decision to pursue this mitigation strategy over another was not ineffective assistance of counsel. We are not persuaded that the evidence in the record unavoidably points towards an opposite result.

The defendant also contends that defense counsel was constitutionally ineffective because of a statement made by counsel during the penalty phase closing argument: "I am not going to tell you that anything that happened in Chris Stevens's life explains or excuses the events of July 15th, 1993. It doesn't, and he will have to suffer the punishment for that." The State responds that this statement was reasonable because it reminded the jury that recommending a sentence other than death would not mean that they were excusing the defendant for his actions, and would not mean that the defendant would escape with no punishment.

The challenged statement was in the context of surrounding argument urging that the important part of the case before the jury was not whether the defendant committed the crime, but rather what penalty to recommend: a term of years, life imprisonment without parole, or death—any of which constitute severe punishment. Counsel's argument clearly emphasized the importance of mitigating circumstances. The challenged statement taken in context cannot reasonably be understood to have invited the jury to disregard mitigating circumstances. We decline to find deficient performance based on his claims of failure to present sufficient mitigating evidence during the penalty phase and sentencing.

*Stevens v. State*, 770 N.E.2d 739, 753–55 (Ind.2002) (citations, ellipsis, brackets, and quotation marks omitted).

▮ The Indiana Supreme Court extensively reviewed these claims and it was not an unreasonable application of *Strickland* for the Indiana Supreme Court to hold that trial counsel's investigation of mitigating evidence and comments during the penalty phase of trial were within the range of professionally competent assistance.

## H.

The petitioner argues that, "the attorney's dislike of their client created a conflict of interest that adversely affected Mr. Stevens." Petition at 74, docket #18. The Indiana Supreme Court, in reviewing the denial of his post-conviction relief conviction, found that this argument was procedurally defaulted.

> The defendant contends that his two trial counsel disliked him and that their personal animosity toward him interfered with their duty of loyalty to their client, adversely affecting their representation of him, to his prejudice. This issue was not designated in the petition for post-conviction relief and thus may not be raised on appeal.

*Stevens v. State*, 770 N.E.2d 739, 756 (Ind. 2002). The petitioner explains in his traverse that this is not really an independent claim, per se, but rather it is

> no more than an extension and reiteration of defense counsel's hiring and utilization of Dr. Lennon and the resultant prejudice that enured to Mr. Stevens' as a result of defense counsels' [sic] the [sic] opening the door to the prior misconduct and future dangerousness.

Traverse at 69, docket #69. To the extent that this is an independent claim, it is procedurally defaulted. To the extent that this is an extension and reiteration of other arguments, it was inherently addressed by the Indiana Supreme Court and by this court in conjunction with those other arguments.

## I.

In his traverse, the petitioner withdrew several of his claims related to ineffective assistance of counsel.

The following ineffective assistance of counsel subclaims, which were originally parts of Mr. Stevens' Third Claim for Relief in his Petition, are hereby withdrawn as free standing, independent claims: (1) failure to adequately address the voluntariness of Mr. Stevens' confession; (2) the failure to object to victim impact evidence during the guilt phase; (3) the failure to present guilt phase witnesses; (4) IAC resulting in Mr. Stevens' loss of the right to testify.

Traverse at 85, docket # 69. Therefore those claims need not be further addressed in this memorandum.

### J.

■■■ The petitioner argues that, "counsel failed to request a second change of venue". Petition at 82, docket # 18. The Indiana Supreme Court addressed this argument in the appeal from the denial of his post-conviction relief petition.

The defendant contends that he was prejudiced by his counsel's deficient performance when they failed to seek a second change of venue. Upon motion of defense counsel, the case was removed from Putnam County, where the crime was committed, and venued to Tippecanoe County, two counties north of Putnam County. The defendant now argues that both counties are within the Indianapolis media market, that his counsel had no strategic reason to keep the case in Tippecanoe County, and that the failure to seek a second change of venue prejudiced him by denying him his right to a trial by an impartial jury.

The post-conviction court found that defense counsel were not ineffective for failing to make a second motion for a change of venue due to pretrial publicity. The court found that, given the inherent newsworthiness of the case, media coverage would have been preva-

lent anywhere and although the coverage was at times extensive it was not necessarily on the front page as it would have been in Putnam County. The court also found that Stevens failed to demonstrate prejudice as the trial record showed that every panel of the venire was carefully questioned about pretrial publicity by the court, State, and defense counsel. The evidence does not compel a decision opposite that reached by the post-conviction court.

*Stevens v. State*, 770 N.E.2d 739, 750–51 (Ind.2002) (footnote omitted). The petitioner's arguments demonstrate, at most, that jury selection was difficult and time consuming, not impossible, as a result of the pre-trial publicity in Tippecanoe County. The petitioner argues that there were numerous prospective jurors who had been exposed to media reports about the case. To the extent that jurors with media exposure were seated on the jury, that is a jury selection question, not a question of venue. It was not unreasonable for the Indiana Supreme Court to have found that the petitioner was neither prejudiced by nor denied the effective assistance of counsel because they did not seek a second change of venue.

### K.

The petitioner argues that, "the juror questionnaire provided no useful guidance" (petition at 84, docket # 18) and that there was ineffective assistance of counsel "during voir dire" (petition at 85, docket # 18). The Indiana Supreme Court addressed these arguments in reviewing the denial of his post-conviction relief petition.

The defendant challenges his trial counsel's performance in jury selection and particularly as to the jury questionnaires submitted to prospective jurors.

He argues that his trial counsel used questionnaires that failed to address

mitigation issues or to explain the meaning of "life without parole," and thus failed to ensure that prospective jurors understood they could address future dangerousness with this sentencing option. We first note that the questionnaire form was not generated by counsel but prepared by the trial court and submitted to counsel for review. Jury questionnaires are a useful tool employed by courts to facilitate and expedite sound jury selection. Their proper purpose is not to condition or indoctrinate prospective jurors with the parties' contentions, notwithstanding attempts of some counsel to the contrary. Ineffective assistance of counsel may not be based upon an alleged failure of counsel to thus misuse jury questionnaires.

The defendant further alleges that his counsel were deficient in jury selection by failing to integrate their mitigation theory into the *voir dire* process, and to exhaust peremptory challenges. We have held that it is *permissible* to use *voir dire* to inquire into jurors' biases or tendencies to believe or disbelieve certain things about the particular line of defense. The record reveals that defense counsel's *voir dire* questions extensively inquired regarding the jurors' openness to considering mitigating factors to prevent the imposition of the death penalty. We decline, however, to find a criminal defense attorney's performance to be deficient for failing to condition jurors as to the particular mitigation evidence anticipated in an individual case.

The post-conviction court found that trial counsel were not ineffective for failing to exhaust their peremptory challenges. The court noted that, between the two of them, the defendant's trial counsel had spent over fifty hours reviewing the completed jury questionnaires. They challenged nineteen jurors for cause, seventeen of which were granted. The court noted that they used seventeen of their twenty peremptory challenges, but for strategic reasons did not exhaust them because what was coming up was worse. The court also observed that counsel successfully rehabilitated several jurors that the State challenged for cause, forcing the State to exercise peremptory challenges. The evidence does not compel a decision opposite that reached by the post-conviction court.

*Stevens v. State,* 770 N.E.2d 739, 751 (Ind. 2002) (quotation marks and citations omitted; emphasis in original).

■ Both the record, and petitioner's extensive review of it in his traverse, demonstrate that trial counsel knew a great deal about the jury pool. The purpose of the jury questionnaire and *voir dire* is to elicit information from prospective jurors so trial counsel may exercise peremptory and for cause challenges. While it is certainly possible that trial counsel could have done a better job with both the questionnaire and *voir dire,* their performance was not ineffective in that they ultimately obtained a great deal of valuable and insightful information about the prospective jurors.

The petitioner objects to the Indiana Supreme Court's characterization of his argument as a suggestion that the jury should be conditioned or indoctrinated with the questionnaire or during *voir dire.* Nevertheless, the focus of this argument is more on what should have been communicated to the jury pool with the questions than what should have been learned from it by their answers. Without regard to the questions during *voir dire,* both the record and petitioner's review of it make clear, that the prospective jurors answers provided a great deal of information to trial

counsel. Because trial counsel obtained an adequate quantity and detail of information about these jurors, they were not ineffective for not having asked better questions and the Indiana Supreme Court was not unreasonable in finding that trial counsel was not ineffective during jury selection.

The petitioner argues that,

Due to the appellate ramifications attendant to failure to exhaust, reasonably competent counsel would have factored in their belief that their client would be convicted and the case likely to appeal.

Petition at 89, docket # 18. This is a very odd argument. If the petitioner believed that one or more jurors were seated which should have been excused for cause, then he could have argued that his trial counsel were ineffective for not challenging that juror and for not preserving that err for appellate review, but that is not the argument that was presented to the post-conviction court and that is not the argument that is presented here, even though the traverse states that trial counsel did not challenge three of the seated jurors for cause. Because the question of whether any of the jurors should have been excused for cause was not presented to the post-conviction court and because it was not included in the petition, this court will not further address it.

■ This leaves solely the question of whether counsel was ineffective for not exhausting their peremptory challenges. Exhaustion, without a surviving challenge to a seated juror, does not create an issue for appellate review. That is to say, the argument "I exhausted all of my peremptory challenges" is not, standing alone, a legitimate basis for appeal. The state court addressed this argument by finding that the failure to exhaust was reasonable for strategic reasons because the remaining jurors were worse. The Indiana Supreme Court was not unreasonable in holding that trial counsel was not ineffective.

## L.

■ The petitioner argues that trial counsel was ineffective because they "failed to object to the sheriff's decision to force Mr. Stevens to wear a stun belt...." Petition at 96, docket # 18. The Indiana Supreme Court addressed this argument during its review of the denial of his post-conviction relief petition.

The post-conviction court concluded that defense counsel were not ineffective for failing to raise this claim, noting that no evidence was presented that the defendant was impeded in his ability to assist his counsel, that no jurors were aware that Stevens was wearing a stun belt, and that the belt did not affect Stevens's appearance before the jury.

The defendant asserts that while none of the jurors were aware that he was wearing a stun belt, their perception of him was still affected by the fact that he was under restraint. The defendant argues that he was harmed because wearing the belt made him appear to the jurors as emotionally withdrawn, subdued, and unusually silent, which may have influenced them to recommend the death penalty. In the post-conviction proceedings, the defendant presented the testimony of Dr. Robert Kaplan who testified that the wearing of the stun belt at trial would have inhibited the defendant's expression of emotion.

The testimony of five of his capital trial jurors and the affidavit of a sixth juror were also presented. The jurors described the defendant as emotionally withdrawn, silent, and subdued. One juror stated that he did not appear remorseful. Three jurors stated that they observed the defendant interacting with his attorneys by passing notes and whis-

pering. The defendant recognizes that his demeanor and affect as seen by the jurors during trial was essentially the same demeanor and affect they had seen during his videotaped confession.

We conclude that the evidence does not unmistakably lead to a result contrary to the post-conviction court's factual findings. From the circumstances presented in this case, we find no reasonable possibility that but for the failure of trial counsel to object to the stun belt, the results of the guilt phase, penalty phase, or sentencing would have been different.

*Stevens v. State*, 770 N.E.2d 739, 757 (Ind. 2002) (footnote and citations omitted). The petitioner notes that the Indiana Supreme Court does not cite any United States Supreme Court cases in deciding the stun belt issue, but there are no United States Supreme Court cases on stun belts. The petitioner cites *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), *Riggins v. Nevada*, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), and *Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003). The petitioner makes clear that these are cases involving shackling or medicating a criminal defendant at trial; they are not stun belt cases. These cases do not constitute clearly established law as to the question of stun belts. Though useful as analogies, the decision of the Indiana Supreme Court that trial counsel was not ineffective in failing to object to the stun belt was neither contrary to, nor an unreasonable application of, the clearly established law as determined by the United States Supreme Court.

## IV. PENALTY PHASE AND SENTENCING ERRORS

The petitioner alleges that various errors occurred during the penalty and sentencing phases of his trial.

### A.

■ The petitioner argues that there were penalty and sentencing phase errors because of "reliance upon invalid aggravating factors." Petition at 97, docket #18. Specifically, the admission of evidence of "unsubstantiated prior acts of misconduct relating to the killing of one boy and the molestation of 25–30 others, as well as future dangerousness...." Petition at 98, docket #18 (citations omitted). The Indiana Supreme Court addressed this issue on direct appeal.

Stevens claims that his right to a reliable and proportionate sentence was violated when the State elicited testimony from defense expert Dr. Lawrence B. Lennon on cross-examination concerning Stevens' previous sexual molestation of an Indianapolis ten-year-old, his sexual molestations of approximately twenty-five to thirty other children, his alleged shooting and killing of another boy "out west," and Dr. Lennon's opinion regarding Stevens' future dangerousness. Stevens did not object to this line of questioning.

Defense counsel may not have objected because it was so apparent that this testimony was relevant to countering the mitigating evidence which Stevens had up to that point placed before the jury. Stevens "opened the door" by eliciting testimony from various witnesses regarding his non-violent and law-abiding character. The obvious relevance of this evidence was its tendency to indicate that Stevens was not normally a violent or dangerous person, as if the murder of Zachary Snider had been a one-time,

freak occurrence. The State may properly introduce rebuttal evidence tending to disprove mitigating circumstances shown by defendant's evidence. This issue is waived.

*Stevens v. State,* 691 N.E.2d 412, 435 (Ind. 1997) (citations, footnote, and quotation marks omitted). The Indiana Supreme Court was not unreasonable in finding that this evidence was legitimately admitted as rebuttal evidence.

■ The petitioner also argues that the trial judge relied "upon invalid aggravating factors." Petition at 97, docket # 18.

The judge's sentencing statements addresses and accords weight to factors of commission of the crime in a "calculated" manner, "coolly performed with deliberation," "cold-blooded manner," of a crime in a "sexual gratification", becoming "sexually excited after commission of the murder," each of which the court considered as aggravators and added weight to the death side of the scale, none of are among the listed aggravating factors in Indiana Code § 35–50–2–9, a number of which are actually synonymous with "intentional," which had already been found and weighed.

Petition at 105, docket # 18. The Indiana Supreme Court also addressed this issue on direct appeal.

Third, Stevens claims that the trial court improperly considered non-statutory aggravators as part of its sentencing determination in violation of *Bivins v. State,* 642 N.E.2d 928, 955–56 (Ind. 1994).

The sentencing statement begins by setting forth facts supporting the charged aggravators, finding each proven beyond a reasonable doubt. The statement then discusses the mitigating evidence and finds Stevens' troubled childhood and confession to be mitigat-

ing circumstances proven by a preponderance of the evidence. The statement then weighs the aggravating and mitigating circumstances and concludes not only that "the mitigating circumstances are far outweighed by the three aggravating circumstances," but that "the mitigating circumstances are outweighed by the [victim's age] alone." The statement then indicates the court's consideration of the jury's unanimous recommendation for death, placing "significant weight upon the jury's recommendation." The court then states,

The Court having made a separate, independent assessment of the facts of this case, having balanced the aggravating circumstances and the mitigating circumstances, and having found that the mitigating circumstances are not outweighed by the aggravating circumstances, the Court now finds that the death penalty is the appropriate punishment for the defendant, Christopher M. Stevens, and for this crime.

Stevens specifically refers to the following, which concludes the court's sentencing statement:

In addition to the evidence previously discussed, the Court finds this murder was calculated. It was motivated by self-preservation, coolly performed with deliberation, and coupled with the defendant's sexual gratification. The defendant placed the possibility of his arrest for child molesting above the life of a ten year old boy. He stated that if placed in this position he would kill in order to avoid returning to jail. That is exactly what he did. He clearly acted in a cold-blooded manner. After his first attempt to suffocate Zachary was unsuccessful, he acted intentionally and deliberately a second and third time before suc-

cessfully obtaining his goal of permanently silencing the child. Imposition of the death penalty in this case is proportionate to the nature of the offense and appropriate for the defendant, Christopher M. Stevens, and the death penalty is therefore imposed upon Christopher M. Stevens.

Even if the facts articulated in the judge's surplus statement indicate some influence on his decision, they appear mostly to be restatements of facts which would fall within the charged aggravating factors. Stevens himself states,

Such terms as "calculated", "coolly performed with deliberation", and "cold-blooded manner" are no more than synonyms for the culpability element of the (b)(1) aggravator, "intentionally". Ind.Code § 35–50–2–9(b)(1). Likewise, the reference to "sexual gratification" as a reason for sentencing Stevens to death duplicates the underlying felony he found in this aggravator, child molesting.

The molestation and intentional murder of a ten-year-old child by one on probation, especially probation for a previous child molesting conviction, exemplifies a crime and criminal particularly worthy of the severest of penalties. While his confession and troubled childhood were mitigating circumstances properly found present, we agree with the trial court's determination that these weighed far less than the aggravating circumstances. After reviewing the sentencing process and facts supporting the trial court's decision, we determine that the death penalty is appropriate under the code and the constitutions and adequately reflects the nature of the offense and offender.

*Stevens v. State*, 691 N.E.2d 412, 436–37 (Ind.1997) (citations and subsequent history omitted). The trial judge did not apply invalid aggravating factors. After having made the requisite findings, he expressed a reasoned and factually supported personal opinion; nothing more. Indeed, the Indiana Supreme Court expressed the same opinion. Doing so was not error and the Indiana Supreme Court was eminently reasonable and correct in its ruling.

### B.

The petitioner argues that,

Because the charged aggravating circumstances were not proven beyond a reasonable doubt, the jury was not appropriately instructed with regard to matters related to the aggravators and the court double counted the (b)(1) and the (b)(11) aggravating circumstances, Mr. Stevens' penalty phase and sentence were unreliable.

Petition at 106, docket # 18. The Indiana Supreme Court addressed these three arguments on direct appeal. In addressing the argument that the aggravating circumstances were not proven beyond a reasonable doubt, the court stated:

Stevens's death sentence was based, in part, on Zachary Snider being under the age of twelve when murdered. Stevens argues that this aggravator must be understood to require the defendant's actual knowledge of the child's age when he committed the murder, and that insufficient evidence existed to show that on July 15, 1993, he knew Zachary was under twelve.

While acknowledging that this question has never been presented to this Court, Stevens argues that our holding in *Castor v. State* should control. In *Castor* the evidence at trial showed that the defendant might have believed the plain-clothed officers who surrounded him in unmarked cars to be mafia "hit men" when he opened fire and killed one of them. The trial court had instructed

the jury according to our previous decision in *Moore v. State* which stated that the (b)(6) aggravator applies if a defendant "knew or should have known" the victim was a law enforcement officer. Without specifically stating that it was overruling *Moore,* a bare majority of this Court determined that the aggravator required "actual knowledge" on the part of the defendant, rather the lesser "should have known" standard, and reversed and remanded for a new penalty phase trial and sentencing. The *Castor* majority said that the deterrence rationale underlying the aggravator justified the holding:

> The policy at the base of the exercise of the police power here is to create a special deterrence to the direction of physical force against those upon whom the security of the community depends.

> We believe that the societal rationale for imposing death for one who kills a law enforcement official is promoted only if the defendant knew that the victim was a law enforcement official at the time of the killing.

There was necessarily more than deterrence, however, supporting the *Castor* decision. The "knew or should have known" standard of *Moore* would deter *more* law enforcement officer murders because it would cause the hypothetical "rational murderer" to pause before killing someone who plausibly *might* be a law enforcement officer. The *Castor* "actual knowledge" standard, on the other hand, allows the "rational murderer" to err on the side of killing if he has any reason to question the status of his victim. Thus, rather than the articulated "deterrence" rationale, what appears to be the actual justification behind *Castor's* holding is the notion of *moral culpability.* This follows because the holding makes sense only if one views a defendant who knowingly murders a police officer or other public servant as more *deserving* of harsher punishment than one who does not know his intended victim is a police officer. If such a mens rea makes the "cop-killer" more culpable, then logically the aggravator should not apply unless the defendant actually knew it was a police officer at whom he shot.

When one sees the retributive reality behind *Castor's* "deterrence" language, the case before us is easily distinguished. Whereas a defendant may reduce his culpability by showing that he mistook a plain-clothed police officer victim for an average citizen, a defendant will never be able to reduce his culpability by claiming that he reasonably thought his eleven-year-old victim was actually twelve. The legislature has chosen an age-based bright line, rather than a more subjective standard such as "The victim was *a young child,*" presumably to avoid both the vagueness and litigatory problems the less specific language would create. Such a decision was not unreasonable, as twelve is a rational line of demarcation between pre-pubescence and adolescence. Because there is no moral culpability rationale for distinguishing between the murderer of an eleven-year-old child and the murderer of a twelve-year-old child, as there is between "law enforcement officer" and "civilian," the actual knowledge standard of *Castor* is unnecessary for cases involving the victim's age aggravator. Moreover, by applying the victim's age aggravator regardless of the defendant's awareness of his child-victim's age, such murders will be further deterred because their perpetrators will have to be absolutely certain that their victim is twelve or older, or suffer the consequences.

Accordingly, we hold that when the (b)(11) aggravator is charged, all the State need show beyond a reasonable doubt is what the code states: that the victim was less than twelve (12) years of age. Such a rule reflects the legislature's policies of both increased protection of young children and harsher punishment for those who prey upon them. As we stated in *Barger v. State:*

> For most of this century, the legislature has enacted and reaffirmed a consistent public policy aimed at punishing offenders more harshly when the offenders commit crimes against younger children. Younger children are more in need of protection; they are less likely to be able to defend themselves and are more susceptible to adult suggestion and schemes.

*Stevens v. State,* 691 N.E.2d 412, 431–33 (Ind.1997) (citations, footnote, quotation marks, brackets, ellipsis, and subsequent history omitted; emphasis in original). Though the Indiana Supreme Court also addressed the proof of other aggravating circumstances, the petition does not appear to raise any of those other issues here. Nevertheless, the Indiana Supreme Court was not unreasonable in its resolution of all of the petitioner's arguments related to the adequacy of the proof of the aggravating circumstances.

 In addressing the argument that the jury was not appropriately instructed with regard to matters related to the aggravators, the court stated:

> Stevens's death sentence is based in part upon the finding that Stevens killed Zachary Snider while committing the crime of child molesting, Ind.Code Ann. § 35–50–2–9(b)(1)(C) (West Supp.1997). Stevens claims that his due process rights were violated because the jury was not instructed on the presumption of innocence and the requirements of proof beyond a reasonable doubt as to each essential element of the crime of child molesting. Therefore, Stevens argues, the trial court erred when such instructions were not given during the sentencing phase of his trial.
>
> Stevens did not make any objection to the instructions which were allegedly lacking, nor did he tender any of his own. Such failures result in a waiver of the issue on appeal.

*Stevens v. State,* 691 N.E.2d 412, 431 (Ind. 1997) (quotation marks and citation omitted). Though procedurally defaulted, this argument is also substantively meritless. The petitioner's confessions support this aggravating circumstance and as previously discussed, uncorroborated testimony is not inherently unreliable.

 In addressing the argument that the court double counted the (b)(1) and the (b)(11) aggravating circumstances, the Indiana Supreme Court on direct appeal stated:

> Stevens claims that his right to a reliable and proportional sentencing determination was violated when the jury and court considered both the (b)(1)(C) (intentional killing while committing child molesting) and the (b)(11) (victim less than twelve years of age) aggravators as part of their sentencing determination. His argument arises from the fact that at the time of his sentencing hearing, the crime of child molesting was defined as performing or submitting to sexual intercourse or deviate sexual conduct with a child under twelve years of age. Because the (b)(11) aggravator was necessarily proven once the (b)(1)(C) aggravator was proven, Stevens claims that this overlapping impermissibly skewed the balance between aggravators and mitigators against him and undermined the reliability of the sentencing determination.

Stevens cites several cases from other jurisdictions which allegedly support his position. The majority of these cases address death sentences predicated upon murder for pecuniary gain and murder during the course of robbery aggravating circumstances. The rationale behind these cases is best summarized by *State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264, 293–297 (1984) (overlap of murder-to-avoid-apprehension aggravator with murder-while-in-the-course-of-aggravated-robbery aggravator, and the latter with murder-in-the-course-of-kidnaping aggravator), which found that overlapping aggravators unfairly increase the likelihood of a death sentence by inflating the weighing process in favor of the prosecution.

Other jurisdictions have rejected this reasoning. In holding that the two aggravating factors should not be merged as one, the Supreme Court of North Carolina noted that the felony-murder aggravator and the pecuniary gain aggravators examine different aspects of the same crime, thus deserving separate consideration. The Wyoming Supreme Court noted, furthermore, that the rule of merger enunciated by the other cases is premised upon an assumption that the number of aggravating circumstances has some independent significance. In Wyoming, the analysis of the defendant's conduct is qualitative, and the jury is not permitted to base its determination upon the quantitative weighing of aggravating circumstances.

The analyses from North Carolina and Wyoming are persuasive. As in *Oliver*, the aggravating circumstances at issue here address different policies, even though the age of the victim is an overlapping factor in both. The felony-murder aggravator focuses on the defendant's character, finding highly culpable the fact that the mind of the accused has in the same criminal episode formulated and held the intent to kill and the intent to commit one of the enumerated felonies. The age of the victim aggravator, by contrast, focuses on the status of the victim, arising from the need to give heightened protection to younger children and to punish more severely those who harm them. As in *Engberg*, our death penalty statute involves the *weighing*, rather than the *counting*, of aggravating factors. Although Stevens' jurors were not instructed as clearly on this point as were the jurors in *Engberg*, they were told repeatedly that they could only recommend the death or life without parole if they found the mitigating circumstances, if any, "outweighed" (and not "outnumbered") by the aggravating circumstance(s) alleged.

We find no reason to believe that the total aggravating weight given to Zachary's age by the jury would necessarily increase simply because it is mentioned in more than one factor. As the Wyoming Supreme Court said, The sentencing authorities' balancing of aggravating and mitigating circumstances which the Florida court previously had said is never a simple summing of aggravating circumstances, was not disturbed by the separate articulations of what is a single aspect although having separately identifiable characteristics.

*Stevens v. State*, 691 N.E.2d 412, 433–34 (Ind.1997) (footnotes, quotation marks, citations, parallel citations, and ellipsis omitted). As the petitioner repeatedly points out, Indiana is a weighing state and therefore the Indiana Supreme Court was not unreasonable in dismissing this inapplicable, counting-based argument.

### C.

■ The petitioner argues that, "the jury was not instructed on standards for

determining the appropriateness of death or life without parole." Petition at 108, docket # 18. The Indiana Supreme Court addressed this argument on direct appeal.

In *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235, the Court said:

A fair statement of the consensus expressed by the Court in *Furman* is that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.

The respondent in that case argued that this mandate in *Furman* was violated by a scheme that permits the jury to exercise unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty by statute. The Court dismissed this argument, however, because it could not be accepted without overruling the specific holding in *Gregg.* The Court stated:

The approval of Georgia's capital sentencing procedure rested primarily on two features of the scheme: that the jury was required to find at least one valid statutory aggravating circumstance and to identify it in writing, and that the State Supreme Court reviewed the record of every death penalty proceeding to determine whether the sentence was arbitrary or disproportionate. These elements, the opinion concluded, adequately protected against the wanton and freakish imposition of the death penalty.

Similarly, allowing an Indiana trial judge, once the class of death-eligible murderers is narrowed through the balancing of aggravating and mitigating circumstances, the authority to decide with a jury's advice between life without parole and death is not constitutionally impermissible. Assessing slightly different arguments, we reach the same conclusion today in *Wrinkles v. State,* 690 N.E.2d 1156 (Ind.1997). This Court still automatically reviews the appropriateness of all death sentences. Moreover, our system, even with its life without parole amendment, still "rationally distinguish[es] between those individuals for whom death is an appropriate sanction and those for whom it is not," *Spaziano v. Florida,* 468 U.S. 447, 460, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), by using aggravating circumstances which "limit the class of offenders upon which the sentencer is authorized to impose the death penalty," *Sawyer v. Whitley,* 505 U.S. 333, 341–42, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). In order to arrive at a sentence of life without parole, the jury and court must find the existence beyond a reasonable doubt of at least one of the same statutorily prescribed aggravating circumstances as they must find for a sentence of death, and likewise must find the aggravating circumstance(s) outweigh the mitigating circumstances.

Thus, by definition, those who receive a sentence of life without parole are within the class of those eligible for death (i.e., for whom death would be "appropriate"), even if they receive a sentence different than death. It is this narrowing and channeling of the class of murderers which significantly reduces the risk that sentencing of murderers will be "wholly arbitrary and capricious," *Gregg,* 428 U.S. at 189, 96 S.Ct. 2909. As the Court stated in *Lowenfield,* "[t]he use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class

of death-eligible persons and thereby channeling the jury's discretion." 484 U.S. at 244, 108 S.Ct. 546.

Juries and courts could have many different reasons for choosing to sentence a death-eligible defendant to life without parole instead of death. One reason, of course, could be leniency. They could decide that because the aggravating circumstances outweigh the mitigating circumstances the murderer deserves something more than a term of years, but also find some aspect of his case that makes them view death as an unacceptable sentence. Along this same line, the life without parole option allows jurors an intermediate step over the chasm between death and the possibility that the murderer could once again be released into their community some time down the road, a step which presumably could only benefit, rather than hinder, the plight of the murderer who would rather spend his life in prison than die.

Another reason, at the opposite end of the spectrum, could be retribution. The jury and judge could decide that for a particular defendant, spending the rest of his life imprisoned would be *more* of a punishment than a quick and painless death.

Just as "the absence of legislative or court-imposed standards to govern the jury in weighing the significance of [the aggravating circumstances]" did not make Georgia's death penalty scheme unconstitutional, *Zant*, 462 U.S. at 880, 103 S.Ct. 2733, the absence of standards to govern the jury in deciding whether death-eligible defendants should, instead, receive life imprisonment does not make Indiana's death penalty scheme unconstitutional.

Also, by giving the jury and sentencer the additional option of life without parole, the statute allows for the equally important considerations enunciated in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and its progeny, which call for individualized consideration of the circumstances of the defendant, his background, and his crime as part of the sentencing determination. *Spaziano*, 468 U.S. at 460, 104 S.Ct. 3154; *Zant*, 462 U.S. at 879, 103 S.Ct. 2733. For reasons as numerous as there are defendants found death-eligible through the statute's balancing process, life without the possibility of parole may or may not be an alternative sentence bestsuited for each. By leaving the judge and jury to decide for a particular defendant, after finding death *an* appropriate sentence, whether death is *the* appropriate sentence, the statute walks the tightrope between the two quite incompatible sets of commands, of *Furman* and *Lockett*.

*Stevens v. State*, 691 N.E.2d 412, 429–30 (Ind.1997) (quotation marks, citations, parallel citations, footnote omitted; emphasis and brackets in original). The Indiana Supreme Court deeply reviewed and applied the clearly established law. Its interpretation of the law of the United States Supreme Court was not unreasonable.

### D.

██ The petitioner argues that, "the court failed to consider mitigation evidence." Petition at 109, docket # 18. The Indiana Supreme Court addressed this argument on direct appeal.

Second, Stevens claims that the court failed to consider adequately the mitigating evidence he presented. Stevens essentially claims that because the court's sentencing statement summarizes the evidence of his bad childhood and psychological problems and does not present both as detailed or as starkly as he thinks they deserve, the sentencer obviously underrepresented the weight

of this evidence in its weighing process. In finding the defendant's troubled childhood to be a mitigating circumstance proven by a preponderance of the evidence, the court clearly considered Stevens' growing up in an unstable and abusive environment, his being placed in foster care at his mother's request, his father's molestation of his step-sister, his mother's incarceration for drug dealing, and Doctor Lennon's psychological evaluation of him in coming to its finding. While a failure to find *at all* the existence of mitigating circumstances clearly supported by the record may imply that they were improperly overlooked, the sentencing judge is not obligated to credit these factors in the same manner as would the defendant. If a sentencing judge need not ascribe the same weight to the proffered mitigating evidence as the defendant, it stands to reason that the sentencer also need not discuss such evidence in his sentencing statement in as great of detail as the defendant would prefer in order to prove he or she adequately considered it. We find no indication that the trial court improperly considered or improperly weighed the available mitigating evidence.

*Stevens v. State,* 691 N.E.2d 412, 435–36 (Ind.1997) (quotation marks, ellipsis, brackets, citations, footnotes omitted; emphasis in original). The sentencing court did not fail to consider mitigating factors. As the Indiana Supreme Court reasonably states, the sentencing court considered and entered findings about the mitigating evidence; it was not required to detail nor weight the mitigating factors in the way the petitioner wanted.

## V. PROSECUTORIAL MISCONDUCT

### A.

▮ The petitioner alleges that "prosecutorial misconduct committed during voir dire tainted Mr. Stevens' jury and permeated later phases of his trial." Petition at 113, docket # 18. The Indiana Supreme Court addressed these arguments on direct appeal. In response to the petitioner's claim that prosecutorial misconduct occurred when the prosecutor discussed the inadmissibility of "victim impact" (petition at 114, docket # 18) evidence during *voir dire,* the court on direct review stated:

Stevens also alleges that the prosecutor committed misconduct during voir dire by commenting on the existence of inadmissible evidence. After the prosecutor's discussion of aggravating circumstances with the third panel of prospective jurors, he explained that because of *Bivins v. State,* the State could only present evidence relevant to the statutorily prescribed aggravators, and thus any evidence of "victim impact" not relevant to those factors would not be introduced. In response to Stevens' objection, the court admonished the prospective jurors to consider only the evidence presented by the parties, not to speculate on the existence or nonexistence of evidence not presented by the parties, and to disregard the prosecutor's remarks regarding victim impact evidence.

Regardless of whether the prosecution's comment on *Bivins* was improper, it could not be said to have placed Stevens in a position of "grave peril," as its probable persuasive effect on the jury's verdict and/or sentence is nil. First, the comment was innocuous, and the admonishment was more than adequate to cure any minute prejudice the comment could possibly have caused. Second, regardless of what was said by the parties, no reasonable juror could have sat through

this trial without feeling great empathy for Zachary's parents, wondering how he or she would feel if his or her own ten-year-old child were sexually molested by a neighbor, brutally suffocated and strangled, and then dumped over a remote bridge to decompose beyond recognition. The prosecutor's brief, general statement in voir dire regarding *Bivins* and victim impact testimony would not have appreciably contributed to such thoughts by the jurors. In fact, as the State points out, Stevens' *own* counsel's comments were much more likely to stir juror empathy towards the Sniders. In his opening statement on sentencing, Stevens's lawyer said,

> The past three or four days have been about the tragic and horrible death of Zachary Snider. And I don't mean to in any way in whatever I say or do

here to depreciate from that. The Sniders have suffered the most horrible loss you can imagine, the loss of a son. I feel for them. I know you do. We've seen it. Most, if not all, of you have children. There's no greater loss.

We are satisfied the prosecutor's comment on *Bivins* during voir dire did not affect the outcome of Stevens' trial.

*Stevens v. State*, 691 N.E.2d 412, 421 (Ind. 1997) (footnotes, citations, and ellipsis omitted).

Though the continued applicability of the harmless error test for habeas corpus review enunciated in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) [3] has been called into question with the passage of the Anti–Terrorism and Effective Death Penalty Act of 1996 (AEDPA) [4], Pub.L. 104–132,

---

3. "The test ... is whether the error had substantial and injurious effect or influence in determining the jury's verdict. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (citations and quotation marks omitted).

4. Before AEDPA, federal courts assessed, on habeas review, whether a constitutional error was harmless by applying the rule articulated by the Supreme Court in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Under that formula, the federal habeas courts were to inquire, in the case of trial error, whether that error had substantial and injurious effect or influence in determining the jury's verdict. This standard was refined by the Court in *O'Neal v. McAninch*, 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995), which held that where the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of the error, the petitioner must prevail.

It is unclear whether the holdings in *Brecht* and *O'Neal* have survived the pas-

sage of AEDPA. In *Nevers v. Killinger*, 169 F.3d 352 (6th Cir.1999), our colleagues in the Sixth Circuit held that the test set out by the Supreme Court in *Kotteakos* and explicitly reiterated in *Brecht* quite precisely captures Congress's intent as expressed in AEDPA and, therefore, continues to be applicable. The court reasoned that, under *Brecht*, it is the habeas petitioner's burden to demonstrate that the trial error resulted in actual prejudice. If the petitioner is able to make that showing, he will surely have demonstrated that the state court's finding that the error was harmless beyond a reasonable doubt—the *Chapman* standard— was outside the realm of plausible credible outcomes, and therefore resulted from an unreasonable application of *Chapman*. *Nevers* has been followed in the Sixth Circuit, although with a marked lack of enthusiasm. *See Maurino v. Johnson*, 210 F.3d 638, 644 (6th Cir.2000) (following *Nevers* because there has been no intervening Supreme Court decision invalidating that panel's decision). The Eighth Circuit, by contrast, has indicated, in dicta, skepticism about the continued vitality of *Brecht*. *See Whitmore v. Kemna*, 213 F.3d 431, 433 (8th Cir.2000). We need not take sides on this disagreement. Even if we assume that

110 Stat. 1214, and though the question appears to remain unresolved, like the court in *Anderson* it is unnecessary for this court to resolve this question because under either test the prosecutor's comments were harmless error. It was not unreasonable for the Indiana Supreme Court to have found that the prosecutor's comments about excluded victim impact evidence were harmless error and that the admonishment of the trial court was adequate. Neither has the petitioner demonstrated actual prejudice.

### B.

■ In response to the petitioner's claim that uncharged "aggravating factors" (petition at 117, docket # 18) were presented to the jury[5], the Indiana Supreme Court stated:

> Stevens makes several claims about prosecutorial misconduct during voir dire. One allegation arises from the prosecutor's display and reading of the entire death penalty statute, including its list of aggravating circumstances, to each panel of prospective jurors. The record discloses that this occurred as the prosecutor explained the different steps through which the statute requires a capital trial to go, and then asked the prospective jurors if they understood the process and had any questions or problems with it. Stevens failed to object, however, thereby forfeiting appellate review of any alleged error arising from the prosecutor's actions.

*Brecht* articulates a more generous standard than AEDPA, we must conclude that, under that more generous standard, the error was harmless. *See Thomas v. Gibson*, 218 F.3d 1213, 1226 n. 12 (10th Cir.2000). *Anderson v. Cowan*, 227 F.3d 893, 898 n. 3 (7th Cir.2000) (parallel citations, quotation marks, citations, ellipsis, and subsequent history omitted).

In his reply brief, Stevens responds to the State's claim of waiver by inviting this Court to consider the prosecutor's actions under the "fundamental error" doctrine. Even if we were to consider improper the reading, displaying, and explaining the death penalty statute to prospective jurors during voir dire, such actions could not be said to so prejudice the rights of a defendant as to make a fair trial impossible. This is particularly true in Stevens' case, where the court informed the jury several times of the State's burden to prove the existence of at least one of the *charged* aggravating circumstances beyond a reasonable doubt, and the specific findings in the jury's recommendation indicate that only the charged aggravating factors were considered in the balancing process.

*Stevens v. State*, 691 N.E.2d 412, 420 (Ind. 1997) (citations, footnote omitted). It was not unreasonable for the Indiana Supreme Court to have found that reading the statute to the jury was harmless error and that the instructions to the jury and its findings related to the aggravating factors were adequate. Neither has the petitioner demonstrated actual prejudice. The petitioner also argues that the introduction of Dr. Lennon's testimony and report constituted prosecutorial misconduct because of their discussion of uncharged aggravating factors. Dr. Lennon's testimony and report have been discussed several times in other parts of this memorandum. It is unnecessary to repeat those details here again; and, for the reasons previously ex-

5. Though the traverse states that it is withdrawing the claims related to the "prosecution reading and displaying the entire death penalty statute during voire dire" (Traverse at 138, docket # 69), he nevertheless argues this issue later in the traverse, therefore the court addresses it.

plained, their introduction was not prosecutorial misconduct.

## C.

■ The petitioner's claims that the prosecutor erroneously explained to the jury the determination of "mitigating factors and weighing process" (petition at 120, docket # 18) for determining mitigation. He also claims that the prosecutor made "appeals to God, community, conscience and emotion" (petition at 121, docket # 18). While the respondent is undoubted correct that these arguments are procedurally defaulted, this court has long been loath to bottom its decisions solely on procedural grounds except where the law and the facts clearly require it. Here it is unnecessary to rest solely on procedural default because these arguments are simply without merit. The petitioner notes that the prosecutor discussed with the jury mitigating factors and how to weigh them. While it is far from clear that these remarks were meaningfully erroneous, the simple fact remains that the court properly instructed the jury and there is no evidence that the jury failed to follow those instructions. Therefore any error which might have existed was cured and the petitioner did not suffer any actual prejudice thereby.

Without any case citations, the petitioner notes that the prosecutor made references to God, community, conscience and emotion. These passing religious references were merely colloquial hyperbole and did not result in actual prejudice. Additionally, the respondent is correct that the United States Supreme Court has "recognized that in a capital sentencing proceeding, the Government has a strong interest in having the jury express the conscience of the community on the ultimate question of life or death." *Jones v. United States,* 527 U.S. 373, 382, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (quotation marks omitted).

## D.

■ The petitioner alleges that "throughout the trial the prosecution deliberately and repeatedly presented irrelevant and inadmissible evidence with the dual purposes of implying prior uncharged conduct and behavior in conformity therewith." Petition at 122, docket # 18. The Indiana Supreme Court addressed these arguments on direct appeal.

Stevens argues that the trial court erred by allowing the State to admit testimony regarding Stevens' contact with Zachary during the two months before the murder. He points to testimony showing that Stevens had attended a Bible study class held in the yard of Alex Krouse which Alex had also attended, that Stevens had attended and videotaped one of Zachary's Little League baseball games at which he offered five dollars to any boy who hit a home run, and that Stevens had taken Zachary fishing. Stevens claims this testimony was inadmissible under Indiana Rule of Evidence 404(b).

The Indiana Rules of Evidence provide that all relevant evidence is generally admissible. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. The State's theory of the case was that Stevens killed Zachary to prevent him from disclosing Stevens's sexual molestations of Zachary. Thus, the circumstantial evidence at issue was relevant in that it allowed the jury to infer an ongoing relationship between the two, which corroborated the testimony of Mark Ste-

vens and appellant's confession regarding motive.

Stevens' argument that Rule 404(b) proscribes admission of this testimony is misdirected, for Rule 404(b) does not apply to this evidence. Commonly known as a rule addressing uncharged misconduct, or prior bad acts has normally applied to evidence of a defendant's extrinsic activity which reflects adversely on his character. Videotaping a baseball game, attending a neighborhood Bible study, and taking a child fishing are not extrinsic activities which would, by themselves, indicate any unsavory character trait with which Stevens' could have acted in conformity on the day of Zachary's murder. Only after corroborating the direct evidence of motive contained in both Mark Stevens' testimony and the appellant's own confession does the challenged evidence take on a darker inference.

Because this evidence does not fall within the ambit of 404(b), its admissibility is left to the balancing test of Rule 403. We conclude that this evidence tends to corroborate the testimony of Mark Stevens and appellant's own confession, and that any unfair prejudice that might accrue from it is slight.

*Stevens v. State,* 691 N.E.2d 412, 422–23 (Ind.1997) (footnotes, quotation marks, and citations omitted). The Indiana Supreme Court was not unreasonable in finding that this evidence was relevant and admissible. Therefore it could not be prosecutorial misconduct to admit it.

### E.

The petitioner alleges that the prosecutor engaged in a "deliberate and malicious mischaracterization of law" in describing manslaughter. Petition at 125, docket # 18. Since no manslaughter instruction was given to the jury, this claim is moot.

### F.

■ The petitioner alleges that the prosecutor "present[ed] . . . perjured testimony." Petition at 126, docket # 18. In a prior order in this case, this court faced the question of what promise, if any, was made to Tracey Eastin and whether he perjured himself.

The petitioner requests that this court expand the record to include two letters. The first letter was written by Tracy Eastin to Robert Lowe. Mr. Eastin was an inmate who testified during the penalty phase of the petitioner's trial. Mr. Lowe was the prosecutor. The second letter was written by Mr. Lowe to "To Whom It May Concern."

\*　　\*　　\*　·　\*　　\*　　\*

Mr. Eastin testified in response to questions from the prosecutor that he was not promised anything in return for his testimony. Mr. Eastin testified that he had requested a letter in support of a sentence modification, but that Mr. Lowe had refused to make such a promise. After he testified, Mr. Eastin wrote to Mr. Lowe and again requested a letter. This time he specifically mentioned that he wanted the letter in connection with the review of his security level within the Indiana Department of Correction (IDOC) because he had been confronted by other inmates in regard to his testimony. Seemingly in response, Mr. Lowe wrote a letter to "To Whom It May Concern". This letter specifically identified Mr. Eastin's IDOC number and housing assignment as well as making mention of the high level of publicity that the trial received. The letter's only request is that Mr. Eastin "be shown any consideration possible for" his testimony. Based solely on these two letters, petitioner argues that there is an inference that Mr. Lowe may have made

a promise to Mr. Eastin to write a letter on his behalf, though counsel rightly concedes that these letters do not prove that any promise was made prior to Mr. Eastin's testimony. The petitioner argues that this is a showing of good cause for discovery to determine whether a promise was made.

An examination of the letters does not indicate that this was the type of letter that Mr. Eastin wanted when he requested assistance with a sentence modification. Mr. Eastin appears to have originally wanted help to obtain an early release from prison, but what he appears to have gotten was help to obtain a safe housing assignment within the prison system so that he could be free from a possible assault from fellow inmates who were upset with his having testified against the petitioner. Though it is impossible not to call this a benefit, it is a benefit that Mr. Eastin could have obtained on his own merely by not testifying and thereby avoiding the wrath of other inmates. In this sense, Mr. Eastin gained no advantage from his testimony even though he did obtain a letter; that is to say, Mr. Eastin was no better off having testified and having received the letter than he would have been had he not testified. Though the letter could be used elsewhere because it is addressed to "To Whom It May Concern" and does not indicate to what address it was mailed, there is no indication or reasonable inference that this letter has been used anywhere other than within the Indiana prison system. There being no indication or inference that Mr. Eastin has benefitted from the letter, relative to his position prior to his testimony, there is no evidence that Mr. Lowe fulfilled the postulated promise. As such, any discovery related to whether there was a promise made to Mr. Eastin would be based on mere speculation.

Order of April 12, 2004 at 2 and 4–6, docket # 39. That order denied the motion to expand the record and the motion to conduct discovery. Without those letters in the record, there is no factual support for the argument that the prosecutor presented perjured testimony. Nevertheless, as the previous order made clear, even with those letters, there would be no substantive merit to the claim that the prosecutor proffered perjured testimony.

### G.

In his traverse (docket # 69 at 138), the petitioner withdrew his claims related to "various acts of government interference". Petition at 130, docket # 18. Therefore those claims need not be further addressed in this memorandum.

### VI. STUN BELT

■ The petitioner alleges that,

In the absence of a showing of need and in violation of his rights to due process, trial without restraint, effective assistance of counsel and a fair trial as guaranteed by the Fifth, Sixth and Fourteenth [Amendments] to the United States Constitution, Mr. Stevens was forced to wear a concealed stun belt throughout his trial.

Petition at 133, docket # 18. The ineffective assistance of counsel claim was addressed earlier in this memorandum. The Indiana Supreme Court, in its review of the denial of his post-conviction relief petition, found the independent claims to be procedurally defaulted.

The defendant devotes a substantial section of his brief to his claim that the sheriff's decision to place a stun belt on the defendant during trial is reversible error. This Court has recently declared that stun belts may not be used on defendants in Indiana courtrooms. To

the extent that the defendant asserts this issue as an independent claim, however, this issue is procedurally defaulted because it was not raised at trial or on direct appeal.

*Stevens v. State,* 770 N.E.2d 739, 756–57 (Ind.2002) (footnote and citations omitted). The Indiana Supreme Court was correct that the petitioner was procedurally defaulted and did not have an independent stun belt claim. The petitioner asserts "[t]hat the Indiana Supreme Court chose not to address the issue, therefore, does not constitute an adequate and independent state law ruling supportive of procedural default." Traverse at 169, docket # 69. The Indiana Supreme Court did address this issue and it found that it was procedurally defaulted because it was not preserved for review. It is irrelevant that the post-conviction court addressed the merits of this claim in addition to finding that it was procedurally defaulted. Furthermore, the Indiana Supreme Court did address the merits of the stun belt claim, albeit under the rubric of the ineffective assistance of counsel claim.

Citing *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), the petitioner argues that, "[t]here was sufficient 'cause and prejudice' to forgive any procedural default ... [because] [t]he failure of counsel to object to errors of this magnitude constitute ineffective assistance of counsel." Traverse at 168, docket # 69. The petitioner's ineffective assistance of counsel claim based on the failure to object to the stun belt has already been denied. Therefore, "cause and prejudice" does not exist to revive the independent stun belt claim.

The respondent asserts that this claim is procedurally defaulted, but the petitioner argues that the respondent waived the exhaustion requirement of 28 U.S.C.

§ 2254(b)(1)(A) as provided for in subpart (b)(3) when he wrote:

In addition, Respondent notes that Petitioner has sought both direct review and state post-conviction review of his conviction and sentence. Accordingly, Respondent believes that Petitioner has effectively exhausted his state court remedies as no further meaningful avenues of relief in state courts remain with respect to the claims asserted in this petition.

Return at 2, docket # 42. This is not a waiver and the respondent clearly did not intend it to be one since he asserted this defense in his memorandum in support of his return. 28 U.S.C. § 2254(b)(3) provides that

A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, *expressly* waives the requirement.

(emphasis added). The quoted passage from the respondent's return is not an *express* waiver, it is a *general* statement about the procedural posture of the case and it accurately concludes that the petitioner no longer has any opportunity to overturn his death sentence in the state courts of Indiana. That is to say, the respondent agreed that the filing of a habeas corpus petition was *generally* timely and proper because it was not barred by the omission of any post-conviction filing and appeal. It was not an *express* waiver of this specific claim.

## VII. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

The petitioner argues that "Mr. Stevens was denied effective assistance of counsel on direct appeal in violation of the Sixth and Fourteenth Amendments to the United States Supreme Court [sic]." Petition

at 138, docket # 18. In his traverse, he states, "that the subclaims pertaining to victim impact and unspecified instances of governmental interference ... have been withdrawn." Traverse at 188, docket # 69. Nevertheless, he includes victim impact as one of the three subclaims he briefs on this issue in his traverse. Therefore this court will address it along with the other two remaining subclaims.

### A.

■■■ The petitioner argues that his appellate counsel were ineffective for not questioning the reliability of his death sentence pursuant to *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The Indiana Supreme Court addressed this argument in reviewing the denial of his post-conviction relief petition.

The defendant also claims ineffective assistance of appellate counsel alleging that his appellate counsel failed to argue that his sentence was unreliable due to a reduction in the jury's sense of personal responsibility because prospective jurors were repeatedly reminded that they were only recommending a sentence and two jurors were exposed to a prospective juror's comments that she could rationalize rendering a verdict on the ground that the judge would be making the final decision. The post-conviction court found that no evidence was produced at trial or on post-conviction that the jury's sense of personal responsibility was reduced, and that petitioner did not demonstrate that this issue was of greater merit than the issues actually raised on appeal.

The jury selection process lasted five days. The defendant does not cite the record or otherwise direct our attention to the instances in which he claims that prospective jurors were repeatedly reminded that they were only recommend-

ing a sentence. As to his allegation that two jurors overheard another prospective juror's comment, there was no objection by trial counsel, nor did trial counsel challenge to remove the two jurors who overheard the comment.

As noted above, with respect to the defendant's challenge to his appellate counsel's strategic decision to include or exclude this issue, we should be particularly deferential unless such a decision was unquestionably unreasonable. The defendant has failed to demonstrate that his appellate counsel's decision to omit this issue was unreasonable. The defendant has likewise not shown a reasonable probability that the outcome of the direct appeal would have been different if the issue had been presented. We agree with the decision of the post-conviction court to deny relief as to the defendant's claim of ineffective assistance of appellate counsel.

*Stevens v. State*, 770 N.E.2d 739, 760–61 (Ind.2002) (quotation marks, brackets, and citations omitted). Though the Indiana Supreme Court was not unreasonable in its denial of relief on this claim, the petitioner did not have a viable *Caldwell* claim even if his appellate counsel had raised the issue.

Petitioner also maintains that the comments violated the requirement of reliability in the sentencing process articulated in *Caldwell v. Mississippi*. The principles of *Caldwell* are not applicable to this case. *Caldwell* involved comments by a prosecutor during the sentencing phase of trial to the effect that the jury's decision as to life or death was not final, that it would automatically be reviewed by the State Supreme Court, and that the jury should not be made to feel that the entire burden of the defendant's life was on them. This Court held that such comments

present an intolerable danger that the jury will in fact choose to minimize the importance of its role, a view that would be fundamentally incompatible with the Eighth Amendment requirement that the jury make an individualized decision that death is the appropriate punishment in a specific case.

There are several factual reasons for distinguishing *Caldwell* from the present case. The comments in *Caldwell* were made at the sentencing phase of trial and were approved by the trial judge. In this case, the comments were made at the guilt-innocence stage of trial, greatly reducing the chance that they had any effect at all on sentencing. The trial judge did not approve of the comments, and several times instructed the jurors that the arguments were not evidence and that their decision was to be based only on the evidence.

*Darden v. Wainwright,* 477 U.S. 168, 183, n. 15, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (citations, quotation marks, and brackets omitted).

Here the prosecutor's comments were made during voir dire in front of only a small number of the selected jurors; thus even more greatly reducing the chance that they had any effect on sentencing. Neither did the trial judge approve of the comments. Indeed the jury was instructed at least four times that the statements and arguments of counsel were not evidence and that their decision was to be based only on the evidence: during both the preliminary (trial record at 3644) and final instructions (trial record at 4403) for the guilt phase of trial and during both the preliminary (trial record at 4437–38) and final instructions (trial record at 5464) for the penalty phase of trial. Additionally, the jury was specifically instructed as to their role in the determination of the death penalty during both the preliminary (trial

record at 4435) and final instructions (trial record at 5458–59) for the penalty phase of the trial. Since the petitioner did not have a viable *Caldwell* claim, his appellate counsel were not ineffective for failing to raise this argument on appeal.

### B.

 The petitioner argues that his appellate counsel were ineffective because even though they raised the question of duplicate aggravating factors, they

> did not adequately explain nor stress that the failure to instruct Mr. Stevens' jury that the duplicate aggravating factors must be merged in order to avoid the weighing of unduly enhanced cumulative aggravating factors against the mitigating factors.

Traverse at 196, docket # 69. The Indiana Supreme Court addressed this issue in its review of the denial of post-conviction relief.

> The defendant contends that if his appellate counsel would have better presented the issue of overlapping aggravators, there is a reasonable probability that he would have prevailed on appeal. The issue was presented and extensively addressed on direct appeal. The defendant does not persuade us that this issue presented or argued differently would have produced a different result.

*Stevens v. State,* 770 N.E.2d 739, 760 (Ind. 2002) (quotation marks, brackets, and citations omitted). As the petitioner himself notes:

> Mr. Stevens' appellate counsel engaged in a lengthy discussion of the claim. Ex. C, Appellant's Brief at 99– 103. The argument does address rulings in other states holding that duplicate aggravating factors should not be given separate and independent consideration in capital sentencing so as to avoid doubling the weight. Ex. C, Ap-

pellant's Brief at 102–03. None were federal law. The argument goes on to address Eighth Amendment concerns of reliability and proportionality. There is a reference to *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) in support of the proposition that "[t]he function of aggravation is to meaningfully narrow the class of persons for whom death is a possible punishment." Ex. C, Appellant's Brief at 104. Further *Sochor v. Florida*, 504 U.S. 527, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992) is cited for the principle that the inclusion of an invalid aggravating circumstance in the weighing process creates the possibility of randomness, by placing a thumb on death's side of the scale.

Traverse at 195, docket # 69 (quotation marks, brackets, and parallel citations omitted). The petitioner argues that his appellate counsel could have done more. Nevertheless the Indiana Supreme Court clearly grasped and extensively addressed this argument on direct appeal.

X. Overlapping Aggravators

Stevens claims that his right to a reliable and proportional sentencing determination was violated when the jury and court considered both the (b)(1)(C) (intentional killing while committing child molesting) and the (b)(11) (victim less than twelve years of age) aggravators as part of their sentencing determination. His argument arises from the fact that at the time of his sentencing hearing, the crime of child molesting was defined as performing or submitting to sexual intercourse or deviate sexual conduct with a child under twelve years of age. [FN23] Because the (b)(11) aggravator was necessarily proven once the (b)(1)(C) aggravator was proven, Stevens claims that this overlapping impermissibly skewed the balance between aggravators and mitigators against him and undermined the reliability of the sentencing determination.

FN23. Ind.Code Ann. § 35–42–4–3 (West 1986) (age amended to fourteen by Act of Mar. 18, 1994, Pub.L. No. 79–1994, § 12, 1994 Ind. Acts 1097; *(see also* R. at 5470–71 (instruction to jury)).

Stevens cites several cases from other jurisdictions which allegedly support his position. The majority of these cases address death sentences predicated upon "murder for pecuniary gain" and "murder during the course of robbery" aggravating circumstances. *E.g., Cook v. State*, 369 So.2d 1251, 1256 (Ala.1979); *Provence v. State*, 337 So.2d 783, 786 (Fla.1976); *Willie v. State*, 585 So.2d 660, 680–81 (Miss.1991). The rationale behind these cases is best summarized by *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, 293–297 (1984) (overlap of murder-to-avoid-apprehension aggravator with murder-while-in-the-course-of-aggravated-robbery aggravator, and the latter with murder-in-the-course-of-kidnaping aggravator), which found that overlapping aggravators unfairly increase the likelihood of a death sentence by inflating the weighing process in favor of the prosecution. [FN24]

FN24. *See also Cook*, 369 So.2d at 1256 (dual application of robbery-murder and pecuniary gain aggravators "in effect condemn[s] [the defendant] twice for the same culpable act—stealing money"); *People v. Bigelow*, 37 Cal.3d 731, 209 Cal.Rptr. 328, 340, 691 P.2d 994, 1006 (1984) ("[W]e believe the court should construe special circumstance provisions to minimize those cases in which multiple circumstances will apply to the same conduct, thereby reducing the risk that multiple findings on special circumstances will prejudice the defen-

dant"); *Provence,* 337 So.2d at 786 (robbery-murder and pecuniary gain aggravators "refer to the *same aspect* of the defendant's crime," (emphasis in original), causing "one who commits a capital crime in the course of a robbery [to] always begin with two aggravating circumstances against him while those who commit such a crime in the course of any other enumerated felony will not be similarly disadvantaged"); *Willie,* 585 So.2d at 680–81 (improper to not merge felony-murder (robbery) and pecuniary gain aggravators because, "[w]hen life is at stake, a jury cannot be allowed the opportunity to doubly weigh the commission of the underlying felony and the motive behind underlying felony as separate aggravators"); *State v. Rust,* 197 Neb. 528, 250 N.W.2d 867, 874 (1977) ("We think it is not reasonable to construe the definitions [of aggravators] in such a manner as to make them overlap and make the same identical facts constitute two aggravating circumstances").

Other jurisdictions have rejected this reasoning. In holding that the two aggravating factors should not be merged as one, the Supreme Court of North Carolina noted that the felony-murder aggravator and the pecuniary gain aggravators examine different aspects of the same crime, thus deserving separate consideration. *State v. Oliver,* 302 N.C. 28, 274 S.E.2d 183, 204 (1981). The Wyoming Supreme Court noted, furthermore, that the rule of merger enunciated by the other cases "is premised upon an assumption that the number of aggravating circumstances has some independent significance." *Engberg v. State,* 686 P.2d 541, 553 (Wyo.1984). In Wyoming, "the analysis of the defendant's conduct is qualitative, and the jury is not permitted to base its determination upon the quantitative weighing of aggravating circumstances." *Id.*

The analyses from North Carolina and Wyoming are persuasive. As in *Oliver,* the aggravating circumstances at issue here address different policies, even though the age of the victim is an overlapping factor in both. The felony-murder aggravator focuses on the defendant's character, finding highly culpable "the fact that the mind of the accused has in the same criminal episode formulated and held the intent to kill and the intent to commit one of the enumerated felonies." *Lowery v. State,* 640 N.E.2d 1031, 1044 (Ind.1994). *See also Woods v. State,* 547 N.E.2d 772, 794 (Ind.1989) ("The substantially contemporaneous presence of the intent to kill and the intent to commit one of the serious enumerated felonies is the gravamen of [the (b)(1)] aggravating circumstance...."). The age of the victim aggravator, by contrast, focuses on the status of the victim, arising from the need to give heightened protection to younger children and to punish more severely those who harm them. *Barger v. State,* 587 N.E.2d 1304, 1307 (Ind.1992). As in *Engberg,* our death penalty statute involves the *weighing,* rather than the *counting,* of aggravating factors. Although Stevens' jurors were not instructed as clearly on this point as were the jurors in *Engberg,* [FN25] they were told repeatedly that they could only recommend the death or life without parole if they found the mitigating circumstances, if any, "outweighed" (and not "outnumbered") by the aggravating circumstance(s) alleged. (R. at 5458–59, 5461, 5466–67.)

FN25. The trial court in *Engberg* instructed the jury: In making this determination you must use your reasoned judgment. You must weigh the mitigating circumstances against the aggrava-

ting circumstances and in doing so consider the following:

>1. No numerical weight is assigned to any of the mitigating or aggravating circumstances.
>
>2. The enumeration of the aggravating and mitigating circumstances does not indicate the weight to be given to any such circumstance.
>
>3. One aggravating circumstance may be of such a nature as to outweigh one or more mitigating circumstance.
>
>4. One mitigating circumstance may be of such a nature as to outweigh one or more aggravating circumstance.

*Engberg*, 686 P.2d at 553 (internal quotations omitted).

We find no reason to believe that the total aggravating weight given to Zachary's age by the jury would necessarily increase simply because it is mentioned in more than one factor. As the Wyoming Supreme Court said, "The sentencing authorities' balancing of aggravating and mitigating circumstances which the Florida court previously had said is never a 'simple summing of aggravating circumstances,' . . . was not disturbed by the separate articulations of what is a single aspect although having separately identifiable characteristics." *Engberg*, 686 P.2d at 553 (quoting *State v. Dixon*, 283 So.2d 1, 10 (Fla.1973), *cert. denied sub. nom., Hunter v. Florida*, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974)).

*Stevens v. State*, 691 N.E.2d 412, 433–34 (Ind.1997) (emphasis, brackets, and ellipsis in original). The Indiana Supreme Court was not unreasonable in finding that it had extensively addressed the issue on direct appeal and that appellate counsel were not ineffective because the court would not have ruled differently even if the issue had been argued as proposed by post-conviction counsel.

### C.

 The petitioner argues that his appellate counsel were ineffective because they did not add a prosecutorial misconduct claim for showing the jury the victim's photograph five times. The Indiana Supreme Court addressed this claim.

>As to the defendant's assertion that his appellate counsel failed to adequately argue that the State improperly injected victim impact evidence by its use of a photograph of Zachary holding a fish, the designation of alleged ineffective appellate counsel in his petition for post-conviction relief does not identify any claim regarding victim impact evidence or mention the State's use of the photograph. The defendant's petition for post-conviction relief does claim that his appellate counsel was deficient in failing to adequately present a claim that the trial outcome was unfair and unreliable due to the injection of irrelevant and prejudicial evidence proscribed by Ind. Evidence Rule 404(b), but the argument in his appellate brief does not refer to any claimed violation of Rule 404(b). We deem this claim to be procedurally defaulted. Similarly, the defendant's claim that his appellate counsel failed to raise issues of governmental interference was not designated in his petition for post-conviction relief and is thus likewise not available. Furthermore, we have already discussed both of these claims in the context of the defendant's allegations of ineffective assistance of counsel at trial.

*Stevens v. State*, 770 N.E.2d 739, 761 (Ind. 2002) (quotation marks, citations, and footnote omitted). Though, in his traverse, the petitioner withdrew his ineffective assistance of trial counsel subclaims related

to "the failure to object to victim impact evidence during the guilt phase" (traverse at 85, docket # 69), those claims were nevertheless addressed by the Indiana Supreme Court in reviewing the denial of his post-conviction relief petition.

The defendant argues that counsel were deficient in not objecting to victim impact evidence in the State's opening statement and during its case in chief. He first urges that his counsel should have objected to the following remarks during the State's opening statement: "Zachary Snider was a typical ten-year-old. He loved to fish, play ball, ride his bicycle, and he couldn't sit still for long ... His parents, Todd and Sandi Snider, both worked to make ends meet." The defendant also challenges his trial counsel's failure to object to the State's use of a picture of Zachary Snider holding a fish. This picture was passed to the jury and was allegedly displayed by the prosecution on four other occasions during the guilt phase of the trial. Defense counsel never objected to the photograph and the defendant claims they were deficient for not objecting to this "prejudicial drumbeat of victim impact evidence."

The post-conviction court found that defense counsel was not ineffective for failing to object to the introduction and use of the photograph. One of the defendant's defense attorneys testified during the post-conviction proceedings that, while he believed the use of the photograph was repetitive, he observed that it was sometimes prudent to not object so as to not draw the jury's attention to the evidence. A decision to not object to evidence when the objection may be more damaging than the evidence is within the wide range of professionally competent assistance. The trial court concluded, "Defense counsel's decision not to object to the admission of the victim impact evidence was a reasonable decision not to draw the jury's attention to this testimony." We agree. Because this represents reasonable trial strategy and because of the questionable merit of the allegedly omitted objections, the evidence does not compel a decision opposite that reached by the post-conviction court.

*Stevens v. State,* 770 N.E.2d 739, 751–52 (Ind.2002) (citations and brackets omitted). The Indiana Supreme Court was not unreasonable in finding that this ineffective assistance of appellate counsel claim was procedurally defaulted. Neither was it unreasonable in finding that the related ineffective assistance of trial counsel claim was meritless.

## VIII. UNCONSTITUTIONALITY OF THE INDIANA DEATH PENALTY STATUTE

■ The petitioner argues that,

Indiana's death scheme, which is codified at I.C. § 35–50–2–9, is unconstitutional on its face and as applied and ensures the arbitrary and capricious imposition of the death penalty and denial of due process in violation of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

Petition at 140, docket # 18. He also argues that,

The Indiana death penalty statute violates the Supremacy Clause and the Eighth Amendment of the United States Constitution and various international laws including, but not limited to, the Organization of American States treaty and the American Declaration of the Rights of and Duties of Man.

Petition at 152, docket # 18. The Indiana Supreme Court addressed these issues either in his direct appeal or in reviewing

the denial of his post-conviction relief petition.

Although acknowledging that we have previously decided to his detriment many of the arguments he advances, Stevens makes numerous challenges to Indiana's death penalty statute to preserve them should this Court reverse its earlier holdings and for federal review. For those claims previously addressed by this Court adversely to Stevens, [FN 14] as Justice DeBruler said, "The court does not choose to reassess its position at this time." *Daniels v. State*, 528 N.E.2d 775, 783 (Ind.1988).

FN14. *Harrison v. State*, 644 N.E.2d 1243, 1258 (Ind.1995) (prosecutorial discretion in seeking death penalty not unconstitutional); *Fleenor v. State*, 514 N.E.2d 80, 90 (Ind.1987) (death penalty does not violate Art. I, § 18, of the Indiana Constitution); *Lowery v. State*, 640 N.E.2d 1031, 1043–44 (Ind.1994) (jury as recommender rather than as sentencer does not violate *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)); *Peterson v. State*, 674 N.E.2d 528, 541 (Ind.1996) (judicial override provision of death penalty statute does not deprive capital defendant of right to trial by jury); *Miller v. State*, 623 N.E.2d 403, 410 (Ind.1993) (statute does not require sentencer to consider irrelevant enumerated mitigating factors, nor does it ascribe too little weight to non-enumerated mitigating factors); *Bivins v. State*, 642 N.E.2d 928, 947 (Ind.1994) (qualifying language in enumerated death penalty mitigators does not preclude or restrict consideration of relevant mitigating circumstances under the "catch-all" mitigator); *see also Blystone v. Pennsylvania*, 494 U.S. 299, 304–05, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990) (finding statutory scheme having enumerated aggravators with qualifying language, combined with

"catch-all" mitigator, did not prevent jury from considering all relevant mitigating evidence); *Bivins*, 642 N.E.2d at 945–46 (statute does not impermissibly shift burden of proving whether aggravation outweighs mitigation to defendant); *Moore v. State*, 479 N.E.2d 1264, 1281 (Ind.) (1985) (statute not unconstitutional because it does not state that aggravators must be found to outweigh mitigators beyond reasonable doubt); *Woods v. State*, 547 N.E.2d 772, 794 (Ind.1989) (incorporation of guilt phase evidence into penalty phase does not present risk of jury considering nonstatutory aggravating circumstances as part of sentencing determination when trial judge properly instructs jury that it can only consider statutory aggravators); *Miller*, 623 N.E.2d at 411 (statute not unconstitutional because it allows State to present the final closing argument in the penalty phase).

Citing *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), but without reference to any specific pages, Stevens claims that capital juries are more conviction-prone than non-capital juries; therefore, due process requires a prosecutor to submit the issue of capital qualification to a neutral fact-finder before proceeding to select a death-qualified jury. Not only does *Lockhart* fail to support this premise, [FN 15] but it also refers to death-qualified juries as impartial, *see id.* at 175–76, 180, 106 S.Ct. 1758, when reaching its conclusion that death-qualification of juries is constitutionally permissible. We fail to see how submission of a case to an impartial jury could offend notions of due process.

FN15. Stevens' brief states, In *Lockhart v. McCree*, the United States Supreme Court recognized the validity of studies establishing that death qualifica-

tion in fact produces juries somewhat more conviction-prone than non-death qualified juries. Counsel then builds two claims against Indiana's statute upon this premise. An honest approach would have supplied the full quote from *Lockhart:*

> Having identified some of the more serious problems with McCree's studies regarding death-qualified juries being conviction-prone, however, we will assume for purposes of this opinion that the studies are both methodologically valid and adequate to establish that death qualification in fact produces juries somewhat more conviction prone than non-death-qualified juries. We hold, nonetheless, that the Constitution does not prohibit the States from death qualifying juries in capital cases.

*Lockhart,* 476 U.S. at 173, 106 S.Ct. 1758. Not only did the Supreme Court not recognize the validity of these studies (the quote clearly shows the Court merely saying that even if the studies were valid, their validity would not change the outcome of the case before it), but the *four U.S. reporter pages* preceding this quote contain *detailed criticism* of the fifteen social science studies introduced by McCree showing their *insufficiency* at proving that death-qualified juries are more conviction-prone. We do read the cases cited in appellate briefs and have low regard for patently false assertions regarding the precedent from which they are lifted. Ind. Professional Conduct Rule 3.3(a)(1) (A lawyer shall not knowingly make a false statement of law to a tribunal.)

Stevens claims the death penalty statute is unconstitutional because it does not specifically require the sentencer to ascribe some degree of weight to every piece of mitigating evidence offered by a capital defendant. While the statute does not specifically so state, it does require a sentencer, before imposing the death sentence, to find specifically that "any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances." Ind.Code Ann. § 35–50–2–9(k)(2) (West Supp. 1997). By necessity, therefore, the sentencer must ascribe some weight to the mitigating circumstances which actually exist in order to perform such a balance. A sentencer need not, however, ascribe the same weight to the mitigating evidence that the defendant does, nor must it give any weight to evidence which it believes irrelevant or false. *Widener v. State,* 659 N.E.2d 529, 533–34 (Ind.1995) (stating that the sentencing court is not obligated to find that mitigating circumstances exist at all, if in fact they do not). [FN16]

FN16. Alternatively, one might say that by determining such evidence to be false, a sentencer *has* ascribed a weight to such evidence, a weight of "zero."

*Stevens v. State,* 691 N.E.2d 412, 427–28 (Ind.1997) (quotation marks, brackets, subsequent case history, parallel citations, ellipsis, and citations omitted) (emphasis in original).

The defendant challenges the denial of his post-conviction claims that Indiana's lethal injection execution scheme violates international law, and that it contravenes evolving standards of decency, that it constitutes cruel and unusual punishment, and that his death sentence is unreliable.

The first three of these claims were available but not presented on direct appeal and may not be asserted as post-conviction claims. *See Timberlake,* 753 N.E.2d at 597. As to the defendant's claim that his death sentence is unrelia-

ble, he asserts that the jury and the judge were never provided information necessary to make an informed judgment as to the appropriate sentence. He argues that the jury was not informed about his mental disabilities and their interaction with his drug abuse and that the jury was not given a proper understanding of the sentence life without parole. We have considered these claims in the context of his assertions of ineffective assistance of counsel. We decline to consider sentence reliability as an independent freestanding post-conviction claim. *See Saylor v. State,* 765 N.E.2d 535, 544 n. 1 (Ind.2002); *Wrinkles,* 749 N.E.2d at 1187 n. 3; *Allen v. State,* 749 N.E.2d 1158, 1176 n. 28 (Ind.2001).

*Stevens v. State,* 770 N.E.2d 739, 761–62 (Ind.2002) (quotation marks and citations omitted). The Indiana Supreme Court's determinations cannot be said to be unreasonable because the Indiana death penalty statute is not unconstitutional under any theory.

## IX. POST–CONVICTION COURT'S ADOPTION OF PROPOSED FINDINGS

▄▄▄▄ The petitioner argues that,

The post-conviction court's wholesale adoption of the state's proposed findings and conclusions denied Stevens due process and a reliable adjudication of his post-conviction claims.

Petition at 157, docket # 18. The Indiana Supreme Court addressed this issue in its review of the denial of his post-conviction relief petition.

The defendant claims that he was denied a full, fair and unbiased adjudication of his post-conviction claims when the post-conviction court essentially adopted verbatim the proposed findings of fact and conclusions of law submitted by the State. In *Prowell v. State,* we acknowledged that a trial court's verbatim adoption of a party's proposed findings may have important practical advantages and we expressly declined to prohibit the practice. We noted, however, that the wholesale adoption of one party's findings results in an inevitable erosion of the confidence of an appellate court that the findings reflect the considered judgment of the trial court.

The sixty-five pages of findings and conclusions entered by the post-conviction court are for the most part identical to the proposed findings submitted by the State, but we note several differences. For example, the post-conviction court added two sentences to one issue, a couple of paragraphs to another, and corrected some of the misspellings. It is thus evident that the court carefully considered and purposefully used of the individual findings proposed by the State. The extensive findings of fact and conclusions of law addressed all the claims delineated in his petition. While near verbatim reproductions may appropriately justify cautious appellate scrutiny, we decline to hold that the post-conviction court's utilization of the State's proposed findings in the present case constituted a failure to provide the defendant with a full, fair and unbiased adjudication of his post-conviction claims.

*Stevens v. State,* 770 N.E.2d 739, 762 (Ind. 2002) (citations and quotation marks omitted). The petitioner argues that the United States Supreme Court "has long been critical of a court's verbatim adoption of findings of fact prepared by the prevailing party." Petition at 161, docket # 18. Nevertheless, "being critical" is far short of prohibiting the practice or finding a due process violation. "[E]ven when the trial judge adopts proposed findings verbatim,

the findings are those of the court and may be reversed only if clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 572, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). The Indiana Supreme Court was not unreasonable in determining that the near verbatim adoption of proposed findings did not result in a biased adjudication. Furthermore, the Indiana Supreme Court noted that such a situation justifies cautious appellate scrutiny, which they no doubt provided during their review of the denial of his post-conviction relief petition.

The petitioner cites several findings which he alleges are errors caused by adopting the State's proposed findings. Most embarrassingly, he notes that the post-conviction court found that he was guilty of three counts of murder even though there was but a single victim and a single conviction in this case. While such errors are grievously haunting and humiliating, the post-conviction court's other changes to the proposed findings belie the argument that it did not individually review his case. The recitation of the trial record preceding this lapse is accurate and demonstrates that this is but a lamentable example of the kind of word processing errors that occasionally occur in busy law offices and courts. Furthermore, this clearly erroneous finding had no impact on the merits of the petitioner's claims.

The petitioner also cites other alleged errors in the findings of the post-conviction court, but those errors are of a different type and character. They are not evidence of inattention, but of disagreement. An appeal was, and is, the course of action when a party disagrees with the findings of a trial court. Here the petitioner took his appeal and the Indiana Supreme Court was not unreasonable in its review of the post-conviction court's ruling.

## X. CONCLUSION

The petitioner, at various locations in his petition, argues that the cumulative effect of the alleged errors undermines the "reliability in the determination that death is the appropriate punishment...." *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). As discussed throughout this memorandum, this court has not found merit in any of the petitioner's individual arguments. So too, the cumulative effect of his arguments has done nothing to shake this court's substantial belief that death was and is the appropriate punishment in this case. As Chief Justice Shepard stated in the Indiana Supreme Court's opinion on direct appeal,

> The molestation and intentional murder of a ten-year-old child by one on probation, especially probation for a previous child molesting conviction, exemplifies a crime and criminal particularly worthy of the severest of penalties.

*Stevens v. State*, 691 N.E.2d 412, 437 (Ind. 1997).

## XI. ORDER

For the forgoing reasons, the Petition for a Writ of Habeas Corpus (docket # 18) is **DENIED** and the *pro se* letter requesting dismissal (docket # 71) is **DENIED AS MOOT.**

**IT IS SO ORDERED.**